# No. 26-387

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF NEW YORK, KATHLEEN HOCHUL, *Governor of New York, in her Official Capacity*, LETITIA JAMES, *Attorney General of New York, in her Official Capacity*, MARK J.F. SCHROEDER, *Commissioner of the New York State Department of Motor Vehicles, in his Official Capacity*,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF FOR APPELLANT UNITED STATES OF AMERICA

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7234*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4214*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................... 1

STATEMENT OF JURISDICTION ............................................................ 3

STATEMENT OF THE ISSUE ................................................................... 3

STATEMENT OF THE CASE ..................................................................... 3

      A.     Federal Statutory Background ........................................................ 3

      B.     Challenged State Provisions ......................................................... 6

      C.     Prior Proceedings ......................................................................... 9

SUMMARY OF ARGUMENT ................................................................... 12

STANDARD OF REVIEW ......................................................................... 15

ARGUMENT ............................................................................................... 15

I.     The Green Light Law's Tip-Off Requirement Violates the Supremacy Clause ................................................................................... 16

      A.     The Tip-Off Requirement Is Preempted ...................................... 16

      B.     The Tip-Off Requirement Improperly Discriminates Against the Federal Government ................................................................... 22

II.    The Green Light Law's Information-Sharing Restriction Violates the Supremacy Clause ................................................................................. 24

      A.     The Information-Sharing Restriction Is Preempted ..................... 24

      B.     The Information-Sharing Restriction Improperly Discriminates Against the Federal Government .......................................... 29

III.   The Green Light Law's Certification Requirement Violates the Supremacy Clause ................................................................................... 30

A.   The Certification Requirement Directly Regulates the Federal Government ................................................................................. 30

B.   The Certification Requirement Improperly Discriminates Against the Federal Government ................................................................. 36

C.   The Certification Requirement Is Preempted ............................................ 37

CONCLUSION ............................................................................................................. 38

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Arizona v. California,*
    283 U.S. 423 (1931) ............................................................... 31

*Arizona v. United States,*
    567 U.S. 387 (2012) ............................................. 4-5, 16, 19

*United States v. New York*
    814 F. Supp. 3d 266 (N.D.N.Y. 2025) ............................ 3

*Boeing Co. v. Movassaghi,*
    768 F.3d 832 (9th Cir. 2014) ..................................... 36

*City of New York v. United States,*
    179 F.3d 29 (2d Cir. 1999) ................................... 6, 9, 26

*Crosby v. National Foreign Trade Council,*
    530 U.S. 363 (2000) ......................................... 12, 15, 25

*CoreCivic, Inc. v. Governor of N.J.,*
    145 F.4th 315 (3d Cir. 2025) .................................... 32

*GEO Grp., Inc. v. Newsom,*
    50 F.4th 745 (9th Cir. 2022) .................................... 32

*Hancock v. Train,*
    426 U.S. 167 (1976) ............................................ 31, 34

*United States v. City of Arcata*
    629 F.3d 986 (9th Cir. 2010) .................................... 31

*Johnson v. Maryland,*
    254 U.S. 51 (1920) ............................................... 31

*Kearns v. Cuomo,*
    981 F.3d 200 (2d Cir. 2020) .................................... 5, 17

*Lamar, Archer & Cofrin, LLP v. Appling,*
    584 U.S. 709 (2018) .............................................. 27

*Long v. Byrne,*
    146 F.4th 282 (2d Cir. 2025) ................................... 15

*Mayo v. United States,*
319 U.S. 441 (1943) ................................................................................ 30

*McCulloch v. Maryland,*
17 U.S. (4 Wheat.) 316 (1819) ...........................................................2, 31

*In re Neagle,*
135 U.S. 1 (1890) .................................................................................... 33

*North Dakota v. United States,*
495 U.S. 423 (1990) .................................................................... 15, 32, 37

*Reno v. Condon,*
528 U.S. 141 (2000) ............................................................................... 22

*Rudisill v. McDonough,*
601 U.S. 294 (2024) ........................................................................... 27-28

*State of New York v. Department of Justice,*
951 F.3d 84 (2d Cir. 2020) .................................................................. 6, 26

*Texas v. U.S. Dep't of Homeland Sec.,*
123 F.4th 186 (5th Cir. 2024) ............................................................... 35

*United States v. California,*
No. 26-926, 2026 WL 1088674 (Apr. 22, 2026) ........................... 32, 34-35

*United States v. Illinois,*
796 F. Supp. 3d 494 (N.D. Ill. 2025) ..................................................... 26

*United States v. King County,*
122 F.4th 740 (9th Cir. 2024) ............................................................... 23

*United States v. Town of Windsor,*
765 F.2d 16 (2d Cir. 1985) .................................................................... 31

*United States v. Vargas-Cordon,*
733 F.3d 366 (2d Cir. 2013) .................................................................. 17

*United States v. Washington,*
596 U.S. 832 (2022) .................................................................... 23, 29, 36

*Xia v. Bondi,*
137 F.4th 85 (2d Cir. 2025) ................................................................... 27

## U.S. Constitution:

U.S. Const. art. I, § 8, cl. 4................................................................................ 3

U.S. Const. art. VI, cl. 2 ........................................................................... 3, 15

## Federal Statutes:

Title 8 of the U.S. Code:

    § 1101 *et seq.* ................................................................................... 4
    § 1182 ............................................................................................ 29
    § 1226 ....................................................................................... 4-5, 19
    § 1228 ......................................................................................... 4, 17
    § 1229 ......................................................................................... 4, 17
    § 1252c ........................................................................................ 5, 19
    § 1254a ........................................................................................ 4, 17
    § 1255 ............................................................................................ 25
    § 1306 ............................................................................................ 29
    § 1324 ......................................................................................... 5, 17
    § 1373 ....................................................... 2, 5, 9-10, 13-14, 19, 24-28, 37
    § 1534 ......................................................................................... 4, 17
    § 1644 ................................................................... 2, 6, 9, 19, 24-26
    § 1722 ............................................................................................ 38
    §§ 1221-1232 .................................................................................... 4

18 U.S.C. § 2721 ..................................................................................... 22

28 U.S.C. § 1291 ...................................................................................... 3

28 U.S.C. § 1331 ...................................................................................... 3

REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302.................................... 6

## Federal Legislative Materials:

H.R. Rep. No. 104-725 (1996) ....................................................................... 28

S. Rep. No. 104-249 (1996).......................................................................... 28

## Federal Regulations:

8 C.F.R. § 287.7 ..................................................................................... 4-5

**State Statutes:**

2019 N.Y. Laws, ch. 37 ................................................................. 3, 6-7

N.Y. Penal Law § 70.00 .............................................................. 9, 30

N.Y. Veh. & Traf. Law
   § 201 ........................................................ 7-9, 13-14, 16, 21, 24, 28-30
   § 502 ................................................................................. 6-7
   § 508 ......................................................................... 7, 24, 28

**State Legislative Materials:**

N.Y. Bill Jacket, 2019 A.B. 3675, ch. 37 ...........................................6-7

**Other Authorities:**

U.S. Postal Serv., *Employee & Labor Relations Manual* § 831.332(c) (Mar. 2024)............ 35

**INTRODUCTION**

This case concerns an undisguised effort by the State of New York to interfere with federal immigration enforcement, in an enactment known as the "Green Light Law." Although the Green Light Law is nominally designed to provide driver's licenses to individuals who cannot prove lawful presence in the country—an aspect of the statute that is unchallenged here—New York included a number of other provisions that interfere with the operation of federal immigration law.

*First*, and most blatantly, when federal immigration officials seek information from New York officials in connection with any investigation, New York directs its officers to tip off the target of that investigation. Such a provision would be unheard of in any other context—imagine a State requiring routine notification to suspected criminals whom the FBI was investigating—and is no more lawful in the immigration context. New York has no legitimate interest in helping aliens to avoid detection and detention.

*Second*, the Green Light Law includes an "Information-Sharing Restriction" that, with narrow exceptions, prohibits state officials from sharing information gathered as part of the driver's license process with federal immigration authorities. This prohibition conflicts with the express terms of a federal statute, which provides that States may not "in any way restrict" their officials' ability to share "information regarding the citizenship or immigration status" of individuals with federal authorities.

8 U.S.C. § 1373(a); *see also id.* § 1644. It also impermissibly discriminates against the federal government.

*Third*, the Green Light Law imposes a "Certification Requirement" on recipients of Department of Motor Vehicles (DMV) information. Anyone—including any federal official—who receives DMV information must certify that he will not use that information for civil immigration purposes, certify that he will not share that information with immigration authorities, and keep detailed records. Each aspect of the Requirement is backed by criminal penalties. The Supremacy Clause prevents States from directly regulating federal officials in this way. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819). The provision also impermissibly discriminates against the federal government, again in violation of the Supremacy Clause. And finally, the Certification Requirement operates to restrict state and federal officials' ability to share information and, thus, conflicts with Section 1373(a) for the same reasons as the Information-Sharing Restriction discussed above.

The district court nevertheless dismissed the federal government's complaint with minimal analysis. Although the court was correct that a State does not violate the Supremacy Clause merely because its enactments make it more difficult for the federal government to apply immigration law, that general principle does not account for the specific defects in the three challenged provisions. This Court should reverse.

## STATEMENT OF JURISDICTION

The United States invoked the district court's jurisdiction under 28 U.S.C. §§ 1331 and 1345. JA11. The district court dismissed the United States' complaint and entered judgment on December 23, 2025. JA50. The United States filed a timely notice of appeal on February 20, 2026. JA52; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in dismissing the federal government's complaint, which challenged on preemption and intergovernmental-immunity grounds three provisions in New York's Vehicle and Traffic Code that were designed to thwart the enforcement of federal immigration law.

## STATEMENT OF THE CASE

The United States sued to enjoin certain provisions in a New York statute, often called the Green Light Law. *See* 2019 N.Y. Laws, ch. 37. The district court (Judge Anne M. Nardacci) granted defendants' motion to dismiss and entered final judgment. The dismissal opinion (JA27-49) is reported at *United States v. New York*, 814 F. Supp. 3d 266 (N.D.N.Y. 2025).

### A. Federal Statutory Background

The Constitution grants the federal government the exclusive authority to establish a "uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. Based on that authority and others, "[t]he Government of the United States has broad,

3

undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, and related statutes, Congress has created an "extensive and complex" framework for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395.

**1.** As part of its statutory framework, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. At a high level, those procedures govern the investigation of aliens for potential removal, the apprehension and detention of suspected illegal aliens, civil removal proceedings, and ultimately removal of illegal aliens from the United States. *See, e.g.*, 8 U.S.C. §§ 1221-1232.

At various points in the removal process, Congress required immigration officers to provide notice to specified individuals. For example, aliens convicted of certain criminal offenses are subject to expedited removal, *see* 8 U.S.C. § 1228, and those individuals are entitled to "reasonable notice of the charges" against them before removal is effectuated, *id.* § 1228(b)(4)(A). A similar notice requirement applies to ordinary removal proceedings, *see id.* § 1229(a), and other removal hearings, *id.* § 1534(b). In narrow circumstances, the Attorney General must "notify [an] alien" regarding the availability of "temporary protected status." *Id.* § 1254a(a)(3).

By contrast, no statute or regulation requires informing aliens that they are under investigation. *Cf.* 8 U.S.C. § 1226 (discussing apprehension of aliens); 8 C.F.R. § 287.7

4

(providing for immigration detainers). And doing so may constitute criminal harboring. *See* 8 U.S.C. § 1324(a)(1)(A)(iii); *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) ("Examples [of harboring] also include attempts to alert undocumented immigrants to the physical approach of immigration authorities.").

**2.** "Consultation between federal and state officials is an important feature" of Congress's immigration framework. *Arizona*, 567 U.S. at 411. Several provisions in the U.S. Code capture that congressional purpose.

For example, the federal government must communicate with and provide resources to state and local authorities. *See* 8 U.S.C. §§ 1226(d)(1), 1373(c). States are guaranteed constant access to resources that allow them to check whether an individual is an alien, *id.* § 1226(d)(1)(A), and the federal government must respond to any request for an individual's immigration status, *id.* § 1373(c). Indeed, the federal government is obligated to "cooperate with the States to assure that information in" the federal government's control "is made available" to aid in the arrest of certain criminal aliens. *Id.* § 1252c(b).

At the same time, the statutory framework ensures that all government officials—state and federal—remain free to share information with federal immigration authorities. No federal, state, or local government entity may "prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the [Department of Homeland Security (DHS)] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.*

5

§ 1644 (using materially indistinguishable language). This Court has previously upheld the constitutionality of these statutes. *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (rejecting Tenth Amendment challenge); *State of New York v. Department of Justice*, 951 F.3d 84, 112-15, 114 n.27 (2d Cir. 2020) (same).

### B. Challenged State Provisions

In 2019, New York's legislature set out to "secure driving privileges" for illegal aliens. N.Y. Bill Jacket, 2019 A.B. 3675, ch. 37. To that end, the New York legislature enacted a bill that is generally referred to as the Green Light Law. 2019 N.Y. Laws, ch. 37. The Green Light Law established a system by which an individual can obtain a so-called "standard driver's license." To do so, the individual need not provide proof of his lawful status in the United States. N.Y. Veh. & Traf. Law § 502(8)(b). As a result, a standard driver's license does not comply with the federal standards for identification and cannot be used for federal purposes—like commercial air travel or access to a federal building. *See id.* § 502; *cf.* REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 202(b)-(d), 119 Stat. 302, 312-15. Moreover, under New York law, a standard driver's license cannot be used as evidence of "citizenship or immigration status" or as the basis for "investigating, arresting, or detaining a person." N.Y. Veh. & Traf. Law § 502(8)(e)(i). Nor can DMV officials inquire about an individual's immigration status—at least when the individual's license or permit does not meet the federal standards for identification. *Id.* § 502(8)(e)(ii).

None of those provisions are challenged here, as the federal government has not disputed New York's authority to determine its own process for issuing state licenses that do not comply with federal standards for identification. The issue here arises because New York went further to attempt to thwart the enforcement of federal immigration laws by federal officials. The New York legislature did not hide its objectives in this regard, making clear that it wanted to "protect[] the data of those applying" for a driver's license from what it described as "unwarranted release" to federal immigration authorities. *See* N.Y. Bill Jacket, 2019 A.B. 3675, ch. 37.

Three parts of the Green Light Law, each relating to this objective, are at issue here.[1]

*First*, the Green Light Law requires tipping off individuals about federal immigration enforcement efforts (Tip-Off Requirement). New York officials are required to "notify" an individual when federal immigration authorities request DMV information and to provide the "identity of the agency that made such request." N.Y. Veh. & Traf. Law § 201(12)(a). Although no limitation on the Tip-Off Requirement appears on the face of the statute, New York stated in litigation that it would apply this provision only when a request results in sharing information with federal authorities, which would occur only in narrow circumstances under another challenged provision of the statute discussed below.

---

[1] These provisions relate only to non-commercial driver's licenses. *See* N.Y. Veh. & Traf. Law §§ 201, 502, 508.

*Second*, the Green Light Law limits state officials' ability to share information (Information-Sharing Restriction). One broad set of restrictions applies only to federal immigration officials. State officials may not share any "information" maintained by the DMV with federal immigration authorities—including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—unless necessary "to issue or renew a driver's license or learner's permit that meets federal standards," "for an individual seeking acceptance into a trusted traveler program," or "to facilitate vehicle imports and/or exports." N.Y. Veh. & Traf. Law § 201(12)(a). By contrast, a narrower set of restrictions applies to a broader class of individuals who might receive DMV information. With minor exceptions, New York officials cannot disclose any DMV document to any person if that document: contains certain types of information, like photos, addresses, or social security numbers, *id.* § 201(8); is an original record used "to prove identity, age, or fitness," *id.* § 201(9); or shows whether a license meets federal standards, *id.* § 201(10). The state enactment provides, however, that records and information may be shared in response to a judicial warrant or lawful court order—including sharing with federal immigration authorities. *See, e.g.*, *id.* § 201(11).

*Third*, the Green Light Law imposes obligations on any official who receives DMV records or information (Certification Requirement). Those officials, including federal officials, must certify that they will not use the information for civil immigration purposes and that they will not share the information with federal immigration authorities unless pursuant to an arrangement between city, state, and federal agencies

8

that does not enforce immigration law. N.Y. Veh. & Traf. Law § 201(12)(b). Officials who receive DMV information must also record "all uses" of the DMV information and any time that information was shared with federal immigration authorities. *Id.* Violation of any aspect of the Certification Requirement is a class E felony, punishable by up to four years in prison. *Id.* § 201(12)(b)-(c); *see also* N.Y. Penal Law § 70.00(2)-(3).

### C.     Prior Proceedings

**1.**   The federal government sued the State of New York, its Governor, its Attorney General, and its DMV Commissioner, seeking to enjoin the challenged provisions. The complaint included three counts—one based on preemption and two based on intergovernmental immunity. JA20-22.

In the first count, the federal government argued that federal law preempts the Green Light Law. JA20-21. This claim involved both express-preemption and conflict-preemption arguments. Specifically, the federal government argued that two statutes— 8 U.S.C. §§ 1373(a) and 1644—expressly prevent New York from enacting the Green Light Law provisions that restrict sharing DMV information. JA20 (¶¶ 44-45). Separately, the federal government argued that each challenged provision operates as an obstacle to the federal government's ability to enforce its immigration laws. JA20-21 (¶¶ 46-48).

In the second and third counts, the federal government argued that the Green Light Law violates principles of intergovernmental immunity. The federal government argued, in particular, that the Certification Requirement, which threatens criminal

penalties against federal officials, amounts to an unlawful direct regulation of the federal government, JA21 (¶ 52), and that the law more generally discriminates against the federal government by applying to federal immigration enforcement but not to other forms of law enforcement, JA22 (¶ 55).

**2.** As relevant here, the district court dismissed the federal government's complaint for failure to state a claim. JA48.[2]

The district court first concluded that 8 U.S.C. § 1373 does not expressly preempt state law. JA36-39. It found no conflict "apparent from the face of the [federal and state] statutes." JA37. In doing so, the district court focused on the fact that the Green Light Law prevents state actors from "inquiring about the immigration status of standard license applicants." JA37 (quotation marks omitted). As noted, that aspect of the state's law is not challenged here. The district court did not address the prohibition on state officials' sharing whatever information they do possess. *See* JA36-39. The district court went on to state that the statutory phrase "information regarding . . . citizenship or immigration status" does not encompass "all matters relating to citizenship or immigration status," JA38, without specifying what meaning it ascribed to that provision.

---

[2] The district court dismissed the claims against the Governor and Attorney General for lack of standing, *see* JA35, but the federal government does not challenge that conclusion here because complete relief is available from the remaining defendants.

10

Next, the district court rejected the federal government's conflict-preemption arguments. JA39-44. Rather than engaging with the specifics of each provision at issue, the court described the federal government's argument generally as complaining that "it could be easier to enforce federal immigration priorities if federal authorities had unfettered access to New York State's DMV information." JA40. Then, the district court found no preemption because there is no "federal statute that requires New York State to provide DMV information for standard license applicants to federal immigration authorities." JA41. Along the way, the district court purported to "not reach" whether a presumption against preemption applies here, JA36 n.5, but it nonetheless held the government to a "heavy" burden for establishing conflict preemption, *see* JA39 (quotation marks omitted).

The district court next rejected the federal government's direct-regulation arguments, again in general terms. JA44-46. The court interpreted the Green Light Law as broadly "directed to New York State's Commissioner, and not any federal official or agency." JA44. And the court characterized the federal government as only arguing that "the challenged provisions could, in certain situations, have some incidental effect on federal immigration enforcement." JA45. That is not enough to establish direct regulation, the district court reasoned, analogizing the Green Light Law to "a statute or ordinance" that regulates "the mode of turning at the corners of streets." JA45 (quotation marks omitted).

Finally, the district court concluded that the Green Light Law does not improperly discriminate against the federal government. JA46-48. Its entire analysis focused on the purported absence of a comparator—*i.e.*, someone treated differently from the federal government. JA46-48. Without a comparator, the district court concluded, the federal government cannot state a claim for unlawful discrimination.

## SUMMARY OF ARGUMENT

The New York provisions challenged here—three aspects of the Green Light Law—cannot be squared with the Supremacy Clause in the U.S. Constitution. The Supremacy Clause requires state law to yield in the face of conflicting federal law. And the Supremacy Clause is also the basis for the doctrine of intergovernmental immunity, under which States cannot directly regulate or discriminate against the federal government. The three challenged provisions each violate both principles.

**I.** The Green Light Law requires certain state officials to tip off an illegal alien whenever immigration officials request that alien's DMV information. The district court provided no support for the idea that a State can systematically instruct its officers to notify targets of federal investigations and provide them with an opportunity to abscond, which is plainly an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quotation marks omitted). Instead, the district court entirely ignored the operation of the Tip-Off Requirement and addressed the government's argument only in generalities.

12

Separately, the Tip-Off Requirement improperly discriminates against the federal government. The Requirement applies only to requests for information from federal immigration authorities—not other law-enforcement agencies or other state actors. The Tip-Off Requirement, therefore, singles out federal immigration officials and treats them worse than any other individual who requests DMV information.

**II.** The Green Light Law also created an Information-Sharing Restriction, which generally operates to prevent state officers from sharing any DMV information with federal immigration authorities. This aspect of the Green Light Law runs headlong into Congress's express decision to bar such information-sharing restrictions—prohibiting any state statute that "in any way restrict[s]" state actors' ability to share "information regarding . . . citizenship or immigration status" with the federal government. 8 U.S.C. § 1373(a). New York's Information-Sharing Restriction conflicts with Section 1373(a) insofar as it prohibits disclosing an alien's citizenship or immigration status—*i.e.*, his legal status under federal immigration law—or any other information that would bear on that status. The district court erred when it ignored a facial conflict between federal and state law and improperly narrowed the preemptive effect of Section 1373(a).

As above, this provision improperly discriminates against the federal government insofar as certain of its provisions apply only to federal immigration authorities. N.Y. Veh. & Traf. Law § 201(12)(a). New York officials are barred for sharing any manner of "records or information" with immigration authorities, *id.*, while only narrower

13

restrictions serve to prevent sharing information with other individuals, *see id.* § 201(8)-(10). New York cannot single out immigration enforcement in this way.

**III.** Finally, the Green Light Law's Certification Requirement is invalid. Anyone who receives New York DMV information, including federal officials, must (1) certify that he will not use the information for civil immigration purposes, (2) certify that he will not share the information with immigration authorities, and (3) keep detailed records. N.Y. Veh. & Traf. Law § 201(12)(b). New York, however, does not have authority to impose these burdens on federal officers who are executing their federal functions. To the extent the Certification Requirement applies to federal officials and those with whom the federal government deals, that Requirement directly regulates the federal government—something the Supremacy Clause forbids.

More generally, the Certification Requirement is also preempted and improperly discriminates against the federal government—largely for the same reasons detailed above. That Requirement restricts both state and federal officers' ability to share "information regarding . . . citizenship or immigration status" with federal immigration officials—directly conflicting with Congress's express preemption provision, 8 U.S.C. § 1373(a). And it also imposes limits on information-sharing that single out federal immigration officials and those officers who would otherwise share information with federal immigration authorities, thereby discriminating against the federal government in violation of the intergovernmental immunity doctrine.

14

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of a complaint for failure to state a claim. *Long v. Byrne*, 146 F.4th 282, 290 (2d Cir. 2025). In doing so, the Court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (quotation marks omitted).

## ARGUMENT

The Supremacy Clause makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "State law[s] may run afoul of the Supremacy Clause in two distinct ways[.]" *North Dakota v. United States*, 495 U.S. 423, 434 (1990) (plurality opinion). Under the doctrine of intergovernmental immunity, States may not "regulate the [Federal] Government directly or discriminate against it." *Id.* And the preemption doctrine bars both state laws that conflict with an express congressional statute and state laws that "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quotation marks omitted).

Both doctrines apply here, invalidating certain provisions in New York's Green Light Law. While New York plainly has authority to create driver's licenses that do not require the licensee to establish lawful presence, New York went much further in the Green Light Law and enacted three provisions with the purpose and effect of interfering with federal enforcement of federal immigration law. Those provisions cannot stand.

15

## I. The Green Light Law's Tip-Off Requirement Violates the Supremacy Clause

The first challenged provision, the Tip-Off Requirement, obligates state officials to tip off illegal aliens about ongoing immigration investigations. Specifically, whenever federal immigration officials "request" any "records or information" maintained by New York's DMV, the DMV Commissioner must "notify" the relevant individual about that request. N.Y. Veh. & Traf. Law § 201(12)(a). He must also identify "the agency that made [the] request." *Id.* And he must do so promptly, "no later than three days after such request." *Id.*

### A. The Tip-Off Requirement Is Preempted

By enacting the Tip-Off Requirement, New York erected an obstacle to the enforcement of federal immigration law. Accordingly, federal law preempts this state law, and the district court's dismissal decision should be reversed.

**1.a.** The Tip-Off Requirement is an extraordinary provision. When federal officials reach out to their state counterparts for assistance with regard to an individual suspected of violating the federal immigration laws, the state officials must respond by notifying the investigation's target. It is hard to imagine a provision that more obviously "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks omitted). Imagine, for example, if New York imposed a similar requirement that applied to the Federal Bureau of Investigation. That is, whenever the FBI sought state

cooperation with a criminal investigation, state authorities would tip off the target of that investigation. New York cannot seriously contend that state law would be permissible. The Tip-Off Requirement is no more permissible in the immigration context.

Unsurprisingly, federal law does not contemplate that aliens will be warned when they are being investigated and thus have an incentive to abscond. Instead, Congress contemplated notification later in the process. Generally, aliens must be notified before they are removed from the country. 8 U.S.C. §§ 1228(b)(4)(A) (certain criminal aliens), 1229(a) (standard removal proceedings), 1534(b) (certain removal hearings). And in narrow circumstances, aliens must be provided notice of certain rights they have during immigration enforcement proceedings. *Id.* § 1254a(a)(3) (temporary protected status). But there is no general right for individuals to be informed of DHS's enforcement efforts, including any ongoing DHS investigations.

In fact, Congress criminalized some attempts to tip off aliens—specifically, harboring. *See* 8 U.S.C. § 1324(a)(1)(A)(iii). Harboring, as used in Section 1324, means "conduct which is intended to facilitate an alien's remaining in the United States illegally and to prevent detection by the authorities of the alien's unlawful presence." *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013). And an attempt to "alert undocumented immigrants to the physical approach of immigration authorities" is an archetypal example of harboring. *Kearns v. Cuomo*, 981 F.3d 200, 208 (2d Cir. 2020) (citing *Vargas-Cordon*, 733 F.3d at 380).

17

This notice framework makes perfect sense. It is entirely reasonable for Congress to require DHS to provide notice for certain aliens in specified circumstances, *e.g.*, before effectuating removal. But it would be illogical to require every alien under investigation to be provided with similar notice. Any suspect under investigation would be free to hide, flee, or otherwise evade justice. Again, a requirement to tip off targets of investigations would be unthinkable in the criminal context, and it is no more permissible here.

The plain terms of the New York statute confirm that tipping off the targets of federal investigations is the purpose and effect of the Green Light Law. The Tip-Off Requirement requires informing individuals about DHS investigations on an accelerated time frame—notice must be provided within three days of any DHS request for information. And the law requires more than just divulging the fact that an individual's information was requested: the DMV Commissioner must identify the specific entity that requested that information. Providing this information, almost immediately after any DHS request, is exactly the sort of conduct that would allow an alien under investigation to avoid detection or at least to be on alert for specific federal officials.

**b.** To make matters worse, the Tip-Off Requirement does not merely interfere with federal investigations but also imposes untenable burdens on the free flow of information between state and federal officials that Congress expressly contemplated. "Consultation between federal and state officials is an important feature" of Congress's

18

immigration framework. *Arizona*, 567 U.S. at 411. The federal government must make various resources available to the States, all of which allow for streamlined communication. *See, e.g.*, 8 U.S.C. §§ 1226(d)(1) (requiring the government to provide certain resources, including liaisons), 1252c(b) (additional resources), 1373(c) (requiring the federal government to respond to certain requests). And States must allow their officials to communicate with federal immigration authorities. *Id.* §§ 1373(a), 1644. As this Court has recognized, "[a] system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system." *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

The Tip-Off Requirement operates to stymie communication between federal and state officials. Federal officials, who would ordinarily be free to request information from New York officials without concern, now face a significant downside that accompanies any request for information in the form of a Tip-Off Requirement that may allow an illegal alien to hide or flee before immigration officials can detain and remove him. Faced with that possibility, federal officials may choose to avoid requesting DMV records. That undercuts the cooperative scheme Congress envisioned.

Indeed, the Tip-Off Requirement—combined with other provisions in the Green Light Law—causes a complete breakdown in the federal-state cooperation that Congress envisioned and mandated. The Green Light Law bars sharing DMV

19

information with immigration authorities absent narrow exceptions. Those exceptions primarily allow for information pursuant to a federal judicial (*e.g.*, criminal) warrant or a lawful court order. Accordingly, at least under New York law as written, immigration officials would have cause to request DMV records chiefly for criminal aliens—*i.e.*, the worst offenders in the system who are the most likely to attempt to avoid justice. Then, as even defendants admit, state officials are required to tip off those criminal aliens after any DHS request results in the disclosure of information. *See* D. Ct. Dkt. No. 30 at 8-9 (defendants' reply brief). So federal officials cannot make use of state cooperation—which is undisputedly available under state law and envisioned by Congress—without jeopardizing their obligation to arrest, detain, and remove criminal aliens. This scheme unquestionably presents an "obstacle" to the full execution of federal law.

**2.** The district court failed to even address the Tip-Off Requirement in its conflict-preemption analysis. Instead, the court characterized the federal government as arguing only that "it could be easier to enforce federal immigration priorities if federal authorities had unfettered access to New York State's DMV information." JA40. But the Tip-Off Requirement presents a fundamentally different question: whether New York may enact a law that requires informing individuals of ongoing DHS investigations. The district court erred by ignoring that question, upholding the Tip-Off Requirement despite its clear purpose and effect—frustrating the enforcement of federal immigration law.

In district court, New York defended the Tip-Off Requirement as a privacy provision. According to New York, despite the absence of any such limitation in the statutory text, the Tip-Off Requirement applies only when records are actually disclosed. So if DHS requests an individual's records and the DMV Commissioner refuses to comply, New York claims that they would not tip that individual off.

As noted, it is difficult to reconcile that view with the statutory text, which imposes an obligation to provide notice "[u]pon receiving a request for such records or information" and not only upon disclosure of that information. N.Y. Veh. & Traf. Law § 201(12)(a). But even if the Court is inclined to defer to New York's construction of the provision in terms of its scope, even New York's strained construction cannot transform a requirement to notify individuals of DHS's interest in them into a privacy provision. Even as construed by New York, as a privacy provision, the state enactment is hopelessly over- and underinclusive. It is overinclusive because the only circumstances in which New York asserts that the provision applies are circumstances in which even New York believes it is appropriate to share information with federal authorities, such as when there is a judicial warrant and a reason to suspect criminal activity. New York cannot seriously assert that its enactment was designed to protect the privacy interests of individuals subject to criminal warrants, thus ensuring that those individuals are warned that federal investigators have probable cause to believe a crime has occurred.

21

The provision is underinclusive because it centers not on the information that is being shared, but on the purpose of the inquiry. If New York shares information with anyone other than immigration authorities, the Tip-Off Requirement imposes no notification obligation. In addition to evidencing impermissible discrimination against the federal government, *see infra* pp. 22-24, that underinclusiveness makes clear that the statute does not address privacy but instead has the purpose and effect of assisting aliens in evading federal enforcement efforts.

For this reason, Congress's decision to provide certain individuals with notice when their personal information is shared, *see* D. Ct. Dkt. No. 10-1 at 12-13 (defendants' motion to dismiss), has no bearing on the question here. Unlike these statutes, the Tip-Off Requirement has nothing to do with privacy protections. And Congress declined to provide a specific right to privacy for illegal aliens, despite enacting numerous protections for state driver's license information. *See Reno v. Condon*, 528 U.S. 141, 143 (2000) (upholding those protections against constitutional challenges); 18 U.S.C. § 2721(b)(1) (allowing disclosure of protected information for government use).

## B. The Tip-Off Requirement Improperly Discriminates Against the Federal Government

The Tip-Off Requirement is independently invalid under the doctrine of intergovernmental immunity because it unlawfully discriminates against the federal government.

A state law violates the federal government's intergovernmental immunity if it "discriminate[s] against the Federal Government or those with whom it deals." *United States v. Washington*, 596 U.S. 832, 838 (2022) (alteration and quotation marks omitted). And a statute discriminates against the federal government if it "singles [the federal government] out for less favorable treatment or if it regulates [it] unfavorably on some basis related to [its] governmental status." *Id.* at 839 (alteration, citation, and quotation marks omitted).

Here, the Tip-Off Requirement singles out federal immigration officials for less favorable treatment. Only requests by immigration officials are subject to the Tip-Off Requirement; similar requests by New York's law-enforcement officials, or other state law-enforcement officials, do not trigger this statutory provision. The Tip-Off Requirement thus "explicitly treats" federal immigration authorities "differently from" everyone else. *United States v. King County*, 122 F.4th 740, 757 (9th Cir. 2024) (quotation marks omitted).

The district court rejected the federal government's discrimination arguments based entirely on a single conclusion—that the federal government had failed to identify a comparator. JA46-48. It is not entirely clear what the district court meant by this conclusion. The Tip-Off Requirement treats federal immigration authorities differently from any other entity that requests information from the State, so that Requirement, on its face, treats the federal government differently from any comparator one could imagine. And it is not hard to imagine comparators. While the Tip-Off Requirement

23

requires providing an alien notice after any request by federal immigration authorities, it does not require the same notice for requests by any other law enforcement agencies—from New York officials, from municipalities, or from other States, for example—for any purpose. These other law-enforcement agencies would satisfy any comparator requirement even if a specifically identified comparator were for some reason thought to be required.

## II. The Green Light Law's Information-Sharing Restriction Violates the Supremacy Clause

The second challenged provision, the Information-Sharing Restriction, prevents state officials from communicating with federal immigration officers. With narrow exceptions, New York officials cannot disclose any document or record created as part of its DMV process. *See* N.Y. Veh. & Traf. Law §§ 201(8)-(12), 508(3). Nor can those officials share any "information" collected as part of the standard-license system with federal immigration authorities unless pursuant to an arrangement that does not enforce immigration law or if the information is necessary "for an individual seeking acceptance into a trusted traveler program" or "to facilitate vehicle imports and/or exports." *Id.* § 201(12)(a) (applies to "any agency that primarily enforces immigration law").

### A. The Information-Sharing Restriction Is Preempted

The Green Light Law's Information-Sharing Restriction runs headlong into a federal statute, which expressly prohibits certain information-sharing restrictions. *See* 8 U.S.C. § 1373(a); *id.* § 1644. Because Congress has already spoken on the matter, New

24

York's Green Light Law must yield under the Supremacy Clause.  *See Crosby*, 530 U.S. at 372-73.

**1.**  Federal law provides that a "State[] or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration officials "information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a); *see also id.* § 1644 (similar).  The phrase "citizenship or immigration status," as used in Section 1373(a), refers to a person's legal classification under federal law.  The same subsection explains that, at least by way of example, an individual's "immigration status" may be "lawful or unlawful," referring to the individual's lawful presence in the country.  *Id.* § 1373(a); *see also id.* §§ 1373(b) (same), 1644 (similar).  And other provisions in the immigration scheme are in accord.  *See, e.g.*, *id.* §§ 1255 (referencing "unlawful immigration status"), 1357(g)(10)(A) (whether an alien is "lawfully present" provided as an example of information "regarding . . . immigration status").  Thus, by itself, the phrase "citizenship or immigration status" covers any legal classification under the immigration laws—*e.g.*, whether an individual is a citizen, national, alien, or a lawful permanent resident and, with regard to aliens, whether they are removable.

The Information-Sharing Restriction expressly conflicts with Section 1373(a).  For example, if the DMV Commissioner happens to discover that a standard-license applicant is an illegal alien and a violent criminal, state law bars him from sharing that

25

information with federal immigration authorities. This is far from the cooperative system Congress envisioned.

The decision in *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025), is instructive on this point. In that case, the federal government challenged three different Illinois laws. Two contained carveouts, expressly allowing state officials to disclose "citizenship or immigration status" in compliance with federal law. But one lacked a similar carveout: it "restrict[ed] sharing the precise kind of information that [Section] 1373 prohibits restrictions on." *Id.* at 519. As a result, that Illinois law ran "headlong into [Sections] 1373 and 1644." *Id.* The same is true for the Green Light Law here.

The *Illinois* court erroneously went on to reject the government's preemption argument based on concerns relating to the Tenth Amendment and the distinction between preemption provisions and commandeering. But that aspect of the court's analysis has no relevance here, as this Court has already rejected a Tenth Amendment challenge to 8 U.S.C. § 1373. *See City of New York*, 179 F.3d at 35; *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 112-15, 114 n.27 (2d Cir. 2020).

The district court here entirely missed the fundamental flaw in the Information-Sharing Restriction. It saw no conflict "apparent from the face of the [federal and state] statutes," noting that the Green Light Law prevents state actors from "inquiring about the immigration status of standard license applicants." JA37 (quotation marks omitted). But the district court never addressed whether state officials may nonetheless share status information they do possess. *See* JA36-39. As explained, New York law prevents

26

such a disclosure and, thus, runs headlong into Section 1373(a). *See supra* pp. 25-26. The district court utterly failed to address this conflict.

**2.** It is therefore clear, under this Court's precedent, that the district court's dismissal must be reversed, as the state enactment here is invalid at least insofar as it bars disclosure of citizenship or immigration status itself. But the problem runs deeper. Congress chose to expand the scope of Section 1373(a) beyond legal classifications of citizenship or immigration status. States are forbidden from imposing restrictions on the ability to share any "information *regarding* . . . citizenship or immigration status" with federal immigration authorities. 8 U.S.C. § 1373(a) (emphasis added). By using the word "regarding," Congress intended "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018); *see also Xia v. Bondi*, 137 F.4th 85, 91 (2d Cir. 2025). At minimum, this must include facts that bear on an individual's citizenship or immigration status.

The statutory structure confirms as much. In the same section, Congress required DHS to respond to information requests "seeking to verify or ascertain the citizenship or immigration status of any individual." 8 U.S.C. § 1373(c). The absence of "regarding" in Subsection (c) underscores the need to give effect to the breadth the word carries in Subsection (a). *See Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (presumption that "differences in language like this convey differences in meaning"

(quotation marks omitted)). Congress must have intended Section 1373(a) to reach information beyond the legal status of individuals.

Consideration of legislative history would only reaffirm the point. When Congress first prohibited restrictions on the sharing of "information regarding" an alien's "immigration status," a House Conference Report explained that such provisions were intended to enable state and local officials to "communicate with the [Immigration and Naturalization Service (INS)] regarding the presence, whereabouts, or activities of illegal aliens." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.); *see id.* (The provision "is designed to prevent any State or local" prohibition or restriction on "any communication between State and local officials and the INS."). Likewise, the Senate Report accompanying Section 1373 explained that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 19-20 (1996).

Various other information that could be included in DMV records, such as place of birth or country of origin, *see* N.Y. Veh. & Traf. Law §§ 201(8), 508(3), is highly salient to application of the immigration laws and thus plainly qualifies as "information regarding . . . citizenship or immigration status." *See* 8 U.S.C. § 1373(a). And other types of information that would be included in DMV records also bear on immigration status. For example, an alien's current address, *see id.* § 508(3), whether an alien has a

28

social security number, *see id.*, and an alien's employment status, *see id.*, can all be relevant to immigration status. *See* 8 U.S.C. § 1306(b) (failure to update address information results in mandatory detention and removal); *id.* §§ 1182(a)(6)(F)(i), 1227(a)(3)(C) (immigration consequences for fraudulent social security numbers); *id.* §§ 1182(a)(6)(C)(ii)(I), 1227(a)(3)(D)(i) (immigration consequences for working without authorization).

**B. The Information-Sharing Restriction Improperly Discriminates Against the Federal Government**

For essentially the same reasons discussed above with regard to the Tip-Off Requirement, *see supra* pp. 22-24, the Information-Sharing Restriction unlawfully discriminates against the federal government because it "singles [the federal government] out for less favorable treatment." *Washington*, 596 U.S. at 839 (alteration and quotation marks omitted). New York officials are barred for sharing any manner of "records or information" with immigration authorities, N.Y. Veh. & Traf. Law § 201(12)(a), while only narrower restrictions serve to prevent sharing information with other individuals, *see id.* § 201(8)-(10). State actors remain free to share at least some additional information with a host of other law enforcement agencies. The district court's suggestion that the United States needed to find a specific comparator echoes its reasoning with regard to the Tip-Off Requirement and is mistaken for the same reasons.

29

### III. The Green Light Law's Certification Requirement Violates the Supremacy Clause

The final aspect of the Green Light Law challenged here, the Certification Requirement, forces federal officials to change how they perform their federal functions. Any federal officer who receives DMV information must certify that he will not use the information for civil immigration purposes or share the information with federal immigration authorities. N.Y. Veh. & Traf. Law § 201(12)(b). Officials who receive this information must also record "all uses" of that information and any time that information was shared with federal immigration authorities. *Id.* Violation of these requirements is a class E felony, punishable by up to four years in prison. *Id.* § 201(12)(b)-(c); *see also* N.Y. Penal Law § 70.00(2)-(3).

### A. The Certification Requirement Directly Regulates the Federal Government

The Certification Requirement directly regulates the federal government. The Court should invalidate the Certification Requirement as applied to federal officials under the direct-regulation arm of the intergovernmental immunity doctrine.[3]

**1.** The Supreme Court has long recognized that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). States "have no power" to "in any manner control[] the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the

---

[3] As explained below, *see infra* pp. 36-38, the remainder of this provision unlawfully discriminates against the federal government and is preempted.

general government." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819). Accordingly, unless Congress expressly authorizes otherwise—which no one contends here—the "United States may perform its functions without conforming to the police regulations of a state." *Arizona v. California*, 283 U.S. 423, 451 (1931); *see also United States v. Town of Windsor*, 765 F.2d 16, 18 (2d Cir. 1985) ("Absent congressional consent, direct state regulation of the activities of the Government is barred by the Supremacy Clause.").

Decisions of the Supreme Court and courts of appeals illustrate the kinds of state laws that unlawfully regulate the federal government's operations. For instance, in *Johnson v. Maryland*, 254 U.S. 51 (1920), the Supreme Court held that a State could not require a Post Office employee to obtain a driver's license from the State, explaining that the State may not "require[] qualifications in addition to those that the [Federal] Government has pronounced sufficient." *Id.* at 57. Similarly, in *Hancock v. Train*, 426 U.S. 167 (1976), the Supreme Court concluded that a State could not forbid federal facilities from operating without a state pollution permit, as such a requirement improperly "place[d] a prohibition on the Federal Government." *Id.* at 179-80 (quotation marks omitted). And in *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010), the Ninth Circuit invalidated local ordinances that prohibited federal military recruiters from recruiting minors. *Id.* at 991-92. "By constraining the conduct of federal agents and employees," the ordinances impermissibly "regulate[d] the [federal] government directly." *Id.* at 991.

31

These principles apply with full force to the federal government's immigration-enforcement functions. Several courts of appeals have held, for example, that state bans on private detention facilities unlawfully regulated the federal government. *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 325-27 (3d Cir. 2025); *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 759-61 (9th Cir. 2022) (en banc). That is because such laws "prevent[] the federal government from choosing how . . . it will carry out a core federal function." *CoreCivic*, 145 F.4th at 325; *see also GEO Grp.*, 50 F.4th at 757 (explaining that state law would impermissibly "give California the power to control [Immigration and Customs Enforcement]'s immigration detention operations in the state"). And these cases involved regulation of federal contractors; the federal government itself and federal employees have "substantially" greater protection from "state law under the Supremacy Clause." *GEO Grp.*, 50 F.4th at 755; *see also North Dakota*, 495 U.S. at 436-37 (plurality opinion).

Just recently, the Ninth Circuit granted the federal government an injunction pending appeal by applying precisely these principles. *See United States v. California*, No. 26-926, 2026 WL 1088674 (Apr. 22, 2026). In that case, the State of California had enacted the "No Vigilantes Act," which required "any non-uniformed 'federal law enforcement officer' operating in California, with narrow exceptions, to 'visibly display identification' while performing federal law enforcement duties." *Id.* at *1. This statute, the court held, "attempt[ed] to directly regulate the federal government in its performance of law enforcement operations." *Id.* at *5. It did not matter to what

"degree [the California statute] interfered with the activities of the United States." *Id.* After all, a "state law" that "directly regulates the conduct of the United States" is "void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *Id.* Because the No Vigilantes Act sought "to control [federal officers'] conduct in performing law enforcement operations" and purported "to override the federal government's power to determine whether, how, and when to publicly identify its officers," that statute directly regulated the federal government, in contravention of the Supremacy Clause. *Id.*

2.    Under a straightforward application of these principles, the Certification Requirement improperly regulates the federal government.  Federal officials who receive New York DMV information must execute certifications, promising not to use that information for civil immigration purposes and promising not to share that information with immigration authorities, including CBP and ICE specifically.  Those officers must also maintain detailed, potentially onerous records reflecting the uses of the information and the instances of sharing that information with immigration authorities.  If they violate either requirement, New York purports to be able to criminally prosecute federal officials for acting within the scope of their employment and authority.[4]  Put plainly, New York purports to define how a federal official can use

---

[4] Of course, New York has no authority to prosecute federal officials for actions committed within the scope of their duties.  *See, e.g.*, *In re Neagle*, 135 U.S. 1 (1890).

33

information lawfully in his possession. Thus, on its face, the Certification Requirement "places . . . prohibition[s] on the Federal Government." *Hancock*, 426 U.S. at 180 (quotation marks omitted). And it purports to define "whether, how, and when" federal officers can use certain information already in their lawful position. *California*, No. 26-926, 2026 WL 1088674 at *5.

States have no authority to determine the circumstances in which federal officers can carry out their functions; that is for the federal government to decide. And it is abundantly clear that the purpose and effect of the Certification Requirement is precisely to engage in that form of impermissible regulation. For example, defendants admit that the Certification Requirement was intended to limit the purposes for which federal officers can use DMV information. *See* Dkt. 10-1 at 18 (defendants' motion to dismiss). That information can be used for "criminal law enforcement purposes" but not for "civil immigration enforcement purposes." Dkt. 10-1 at 18 (defendants' motion to dismiss). How federal officials may utilize information they lawfully possess is a question for the federal government, not States.

**3.** The district court again failed to engage with the federal government's direct-regulation arguments. It interpreted the Green Light Law as broadly "directed to New York State's Commissioner, and not any federal official or agency." JA44. And the district court characterized the federal government as only arguing that "the challenged provisions could, in certain situations, have some incidental effect on federal

immigration enforcement." JA45. As a result, the district court reasoned, there is no direct-regulation problem.

This analysis entirely misses the point. Federal officials are themselves subject to the Certification Requirement, backed by state criminal penalties. That is a direct—not incidental—impact on federal functions. And the Certification Requirement bears no resemblance to regulations of "the mode of turning at the corners of streets," which might only "affect incidentally the mode of carrying out" a federal function. JA45 (quoting *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024)). Even assuming States can enforce such provisions without federal assent—a proposition that, to our knowledge, has not been tested given that the government often instructs its officers to comply with routine traffic laws, *see, e.g.*, U.S. Postal Serv., *Employee & Labor Relations Manual* § 831.332(c) (Mar. 2024), https://perma.cc/PPA7-L4XR—the Certification Requirement goes much further in imposing potentially arduous requirements directly on federal officials rather than generally applicable rules-of-the-road. Moreover, the district court "asked the wrong question" by "looking to the degree" to which state law "interfered with the activities of the United States." *California*, No. 26-926, 2026 WL 1088674 at *5. That is the standard for regulation of "contractors and third-party employers," not the federal government itself. *Id.*

In district court, New York primarily justified the Certification Requirement as a "condition under which DMV information can be accessed." Dkt. 10-1 at 23 (defendants' motion to dismiss). If New York wanted to withhold information from

35

the federal government unless it obtained promises about what the federal government would do with the information, that could raise preemption and discrimination problems, but that is in any event not what the Certification Requirement does. Instead, as New York admitted in almost the same breath, the Certification Requirement "regulates the permissible uses and disclosures of [DMV] information once access is granted." Dkt. 10-1 at 23 (defendants' motion to dismiss). That goes beyond New York defining the circumstances in which its own officials may share information with the federal government. The Certification Requirement directly regulates the recipient of the information, and when that recipient is the federal government, the provision plainly violates the intergovernmental-immunity doctrine.

## B. The Certification Requirement Improperly Discriminates Against the Federal Government

The Certification Requirement also unlawfully discriminates against the federal government and those with whom the federal government deals. As above, *see supra* pp. 22-24, 29, the Certification Requirement "singles [the federal government] out for less favorable treatment." *Washington*, 596 U.S. at 839 (alteration and quotation marks omitted). Although the requirement applies to all individuals who receive DMV information, those individuals need only certify that the information will not be used for civil immigration purposes or shared with federal immigration authorities. And the various record-keeping requirements are similar, only requiring an individual to record instances in which the information was shared with federal immigration authorities.

36

This provision is, without doubt, targeted at those "with whom [the federal government] deals." *North Dakota*, 495 U.S. at 437 (plurality opinion). A "regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself." *Id.* at 438. Accordingly, those regulations must be "imposed on some basis unrelated to the object's" relationship with the federal government. *See id.*; *see also, e.g.*, *Boeing Co. v. Movassaghi*, 768 F.3d 832, 842 (9th Cir. 2014) (holding that statute which "single[d] out" a government contractor for "a substantially more stringent cleanup scheme" unlawfully discriminated against the government (quotation marks omitted)). The Certification Requirement fails that test: only those individuals who would otherwise provide information to federal immigration authorities are prohibited from doing so. To the extent a comparator is required for this provision, individuals who have no interactions with federal immigration authorities serve as such.

## C. The Certification Requirement Is Preempted

For essentially the same reasons discussed above, *see supra* pp. 24-29, Section 1373(a) in Title 8 expressly preempts aspects of the Certification Requirement. That statutory subsection preempts any state statute that "in any way restrict[s]" an officer's ability to send certain information to federal immigration authorities. 8 U.S.C. § 1373(a). And the Certification Requirement imposes such a restriction—prohibiting any authorized recipient of DMV information from sharing that information with federal immigration authorities. Thus, to the extent the Certification Restriction bars

37

the disclosure of information regarding the citizenship or immigration status of any individual, it is preempted. Indeed, Congress has expressly provided for some information-sharing among federal officials. It has required DHS to "fully integrate all databases and data systems" that it maintains, 8 U.S.C. § 1722(a)(1), ensuring that "any Federal official responsible for determining an alien's admissibility to or deportability from the United States" has access to that information, *id.* § 1722(a)(5).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

 *s/ J. Kain Day*
J. KAIN DAY
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7234*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4214*
  *j.kain.day@usdoj.gov*

April 2026

38

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,820 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ J. Kain Day*
J. Kain Day

**ADDENDUM**

## TABLE OF CONTENTS

8 U.S.C. § 1373.......................................................................................... A1

8 U.S.C. § 1644.......................................................................................... A2

N.Y. Veh. & Traf. Law § 201 ................................................................... A3

N.Y. Veh. & Traf. Law § 502 ................................................................... A5

N.Y. Veh. & Traf. Law § 508 ................................................................... A7

**8 U.S.C. § 1373**

**§ 1373. Communication between government agencies and the Immigration and Naturalization Service**

(a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

(2) Maintaining such information.

(3) Exchanging such information with any other Federal, State, or local government entity.

(c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

**§ 1644. Communication between State and local government agencies and Immigration and Naturalization Service**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

**N.Y. Veh. & Traf. Law § 201**

**§ 201. Custody of records**

\*\*\*

8. Any portion of any record retained by the commissioner in relation to a non-commercial driver's license or learner's permit application or renewal application that contains the photo image or identifies the social security number, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, medical information or disability information of the holder of, or applicant for, such license or permit is not a public record and shall not be disclosed in response to any request for records except: (a) to the person who is the subject of such records; or (b) where expressly required pursuant to chapter three hundred three of part A of subtitle vi of title forty-nine of the United States code;1 or (c) where necessary to comply with a lawful court order, judicial warrant signed by a judge appointed pursuant to article III of the United States constitution, or subpoena for individual records issued pursuant to the criminal procedure law or the civil practice law and rules.

9. The commissioner shall not disclose or otherwise make accessible original documents or copies of documents collected from non-commercial driver's license or learner's permit applicants or renewal applicants to prove identity, age, or fitness except: (a) to the person who is the subject of such documents; or (b) where expressly required pursuant to chapter three hundred three of part A of subtitle vi of title forty-nine of the United States code; or (c) unless necessary to comply with a lawful court order, judicial warrant signed by a judge appointed pursuant to article III of the United States constitution, or subpoena for individual records properly issued pursuant to the criminal procedure law or the civil practice law and rules.

10. The commissioner shall not disclose or otherwise make accessible any portion of any record that identifies whether the type of driver's license or learner's permit that a person holds either meets federal standards for identification or does not meet federal standards for identification except: (a) to the person who is the subject of such record; or (b) where expressly required pursuant to chapter three hundred three of part A of subtitle vi of title forty-nine of the United States code; or (c) unless necessary to comply with a lawful court order, judicial warrant signed by a judge appointed pursuant to article III of the United States constitution, or subpoena for individual records properly issued pursuant to the criminal procedure law or the civil practice law and rules.

11. For the purposes of this section, whenever a lawful court order, judicial warrant, or subpoena for individual records properly issued pursuant to the criminal procedure

A3

law or the civil practice law and rules is presented to the commissioner, only those records, documents, or information specifically sought by such court order, warrant, or subpoena may be disclosed.

12. (a) Except as required for the commissioner to issue or renew a driver's license or learner's permit that meets federal standards for identification, as necessary for an individual seeking acceptance into a trusted traveler program, or to facilitate vehicle imports and/or exports, the commissioner, and any agent or employee of the commissioner, shall not disclose or make accessible in any manner records or information that he or she maintains, to any agency that primarily enforces immigration law or to any employee or agent of such agency, unless the commissioner is presented with a lawful court order or judicial warrant signed by a judge appointed pursuant to article III of the United States constitution. Upon receiving a request for such records or information from an agency that primarily enforces immigration law, the commissioner shall, no later than three days after such request, notify the individual about whom such information was requested, informing such individual of the request and the identity of the agency that made such request.

(b) The commissioner shall require any person or entity that receives or has access to records or information from the department to certify to the commissioner, before such receipt or access, that such person or entity shall not (i) use such records or information for civil immigration purposes or (ii) disclose such records or information to any agency that primarily enforces immigration law or to any employee or agent of any such agency unless such disclosure is pursuant to a cooperative arrangement between city, state and federal agencies which arrangement does not enforce immigration law and which disclosure is limited to the specific records or information being sought pursuant to such arrangement. Violation of such certification shall be a class E felony. In addition to any records required to be kept pursuant to subdivision (c) of section 2721 of title 18 of the United States code,2 any person or entity certifying pursuant to this paragraph shall keep for a period of five years records of all uses and identifying each person or entity that primarily enforces immigration law that received department records or information from such certifying person or entity. Such records shall be maintained in a manner and form prescribed by the commissioner and shall be available for inspection by the commissioner or his or her designee upon his or her request.

(c) For purposes of this subdivision, the term "agency that primarily enforces immigration law" shall include, but not be limited to, United States immigration and customs enforcement and United States customs and border protection, and any successor agencies having similar duties. Failure to maintain records as required by this subdivision shall be a class E felony.

A4

**N.Y. Veh. & Traf. Law § 502**

**§ 502. Requirements for licensing**

\*\*\*

7. Selective service act. The commissioner shall provide separate space on the application for a learner's permit, driver's license, non-driver identification card, or renewal thereof so that any person who is at least eighteen years of age but less than twenty-six years of age who applies to the commissioner for such permit, license, or card or renewal thereof may opt to register with the selective service in accordance with 50 U.S.C. App 451 et. seq., as amended, if such person is subject to such act, and consent to have the commissioner forward the necessary personal information in accordance with this subdivision. Such consent shall be separate from any other certification or signature on such application. The commissioner shall include on the application a brief statement about the requirement of the law, a citation of the act, and the consequences for failing to meet the same. The commissioner shall forward to the selective service system, in an electronic format, the necessary personal information required for registration only of individuals who have affirmatively opted and consented, pursuant to this subdivision, to authorize the commissioner to forward such information to the selective service system.

8. Non-commercial drivers' licenses and learners' permits which do not meet federal standards for identification. (a) Non-commercial drivers' licenses and learners' permits which do not meet federal standards for identification shall be issued in such form as the commissioner shall determine, provided that such licenses and permits shall be visually identical to non-commercial drivers' licenses and learners' permits which do meet federal standards for identification except that such licenses and permits may state "Not for Federal Purposes". Provided, however, that the commissioner may promulgate regulations providing for additional design or color indicators for both such non-commercial drivers' licenses and learners' permits if required to comply with federal law.

(b) Applicants for a non-commercial driver's license or learner's permit or a renewal thereof shall not be required to prove that they are lawfully present in the United States.

(c) Application forms for non-commercial drivers' licenses and learners' permits which do not meet federal standards for identification or for renewal thereof shall not state (i) the documents an applicant used to prove age or identity, or (ii) an applicant's ineligibility for a social security number where applicable, or (iii) an applicant's citizenship or immigration status.

(d) The commissioner and any agent or employee of the commissioner shall not retain the documents or copies of documents presented by applicants for non-commercial

A5

drivers' licenses or learners' permits which do not meet federal standards for identification to prove age or identity except for a limited period necessary to ensure the validity and authenticity of such documents.

(e)(i) A non-commercial driver's license or learner's permit which does not meet federal standards for identification shall not be used as evidence of a person's citizenship or immigration status, and shall not be the basis for investigating, arresting, or detaining a person. (ii) Neither the commissioner nor any agent or employee of the commissioner shall inquire about the citizenship or immigration status of any applicant for a non-commercial driver's license or learner's permit which does not meet federal standards for identification.

***

**N.Y. Veh. & Traf. Law § 508**

**§ 508. Administrative procedures**

\*\*\*

2. Any application required to be filed under this article shall be in a manner and on a form or forms prescribed by the commissioner. The applicant shall furnish all information required by statute and, except as otherwise provided in this title, such other information as the commissioner shall deem appropriate.

3. License record. The commissioner shall keep a record of every license issued which record shall be open to public inspection during reasonable business hours. Provided, however, that the following information whenever contained within the record of non-commercial drivers' licenses and learners' permits shall not be open to public inspection: the photo image, social security number, client identification number, name, address, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, medical information or disability information of any holders of, or applicants for, such licenses and permits, and whether such licenses or permits meet federal standards for identification or do not meet federal standards for identification. Neither the commissioner nor his agent shall be required to allow the inspection of an application, or to furnish a copy thereof, or information therefrom, until a license has been issued thereon.

\*\*\*

A7