# No. 26-387

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLANTS,

v.

STATE OF NEW YORK, KATHLEEN HOCHUL, Governor of New York, in her official capacity, LETITIA JAMES, Attorney General of New York, in her official capacity, MARK J.F. SCHROEDER, Commissioner of the New York State Department of Motor Vehicles, in his official capacity,

DEFENDANTS-APPELLEES.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

**BRIEF OF NEW JERSEY, THE DISTRICT OF COLUMBIA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEVADA, NEW MEXICO, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF APPELLEES**

BRIAN L. SCHWALB
Attorney General
District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

JENNIFER DAVENPORT
Attorney General
State of New Jersey

JEREMY M. FEIGENBAUM
Solicitor General

BENJAMIN M. SHULTZ
Assistant Attorney General

25 Market Street, Box 080
Trenton, NJ 08625
(609) 728-5207
benjamin.shultz@njoag.gov

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI CURIAE ...................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ....................................................................................5

    I.    States Have Reasonably Exercised Their Police Powers To Make Policy Decisions That Enhance The Safety Of Their Roads ................5

    II.    Federal Immigration Law Does Not Preempt The Challenged Provisions ................................................................................11

        A.    Federal immigration law does not expressly preempt the information-sharing restriction and certification requirement ........................................................................13

        B.    The notification provision does not stand as an obstacle to the implementation of federal immigration law .......................17

        C.    Interpreting the INA to preempt the challenged provisions would amount to unconstitutional commandeering..................21

    III.    The Challenged Provisions Do Not Violate Intergovernmental Immunity Principles .........................................................................24

CONCLUSION ..................................................................................28

# TABLE OF AUTHORITIES

## *Cases*

*Altria Grp., Inc. v. Good*,
555 U.S. 70 (2008)................................................................. 18, 19

*Bond v. United States*,
572 U.S. 844 (2014)...................................................................18

*Bradley v. Pub. Utilities Comm'n of Ohio*,
289 U.S. 92 (1933).................................................................. 5, 18

*Chamber of Com. v. Whiting*,
563 U.S. 582 (2011) ............................................................... 14, 17

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) .................................................. 16, 17

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) ...........................................................24

*County of Ocean v. Grewal*,
475 F. Supp. 3d 355 (D.N.J. 2020)........................................ 14, 15

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990)................................................................. 11, 12

*Grand River Enter. Six Nations, Ltd. v. Boughton*,
988 F.3d 114 (2d Cir. 2021) .........................................................12

*Hancock v. Train*,
426 U.S. 167 (1976)......................................................................25

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Litig.*,
725 F.3d 65 (2d Cir. 2013) ...........................................................17

*Kane v. New Jersey*,
242 U.S. 160 (1916)......................................................................18

*Kansas v. Garcia*,
589 U.S. 191 (2020)................................................... 12, 17, 20, 21

ii

*Kearns v. Cuomo*,
   981 F.3d 200 (2d Cir. 2020) ........................................................ 18, 20

*McHenry County v. Raoul*,
   44 F.4th 581 (7th Cir. 2022) ................................................... 22, 25, 27

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) ....................................................................... 12

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018) ............................... 3, 11, 15, 16, 21, 22, 23, 24

*New York v. Dep't of Just.*,
   951 F.3d 84 (2d Cir. 2020) .............................................................. 24

*New York v. United States*,
   505 U.S. 144 (1992) ................................................ 15, 18, 21, 22, 24

*North Dakota v. United States*,
   495 U.S. 423 (1990) ................................................................. 24, 25

*Nwauzor v. GEO Grp., Inc.*,
   127 F.4th 750 (9th Cir. 2025) .......................................................... 26

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*,
   8 F.4th 176 (3d Cir. 2021) .............................................................. 16

*Printz v. United States*,
   521 U.S. 898 (1997) ................................................................. 21, 28

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) ....................................................................... 12

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ............................... 14, 15, 20, 21, 25

*United States v. Illinois*,
   796 F. Supp. 3d 494 (N.D. Ill. 2025) ............................................... 15

*United States v. Snyder*,
   852 F.2d 471 (9th Cir. 1988) .......................................................... 18

*United States v. Washington*,
  596 U.S. 832 (2022)................................................................. 24, 26, 27

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019)...........................................................................17

*Washington v. United States*,
  460 U.S. 536 (1983)...........................................................................27

*Williams v. Marinelli*,
  987 F.3d 188 (2d Cir. 2011) ..............................................................17

## Constitutional Provisions

U.S. Const. art. VI, cl. 2......................................................................21

## Statutes

8 U.S.C. § 1101 ....................................................................................2

8 U.S.C. § 1228 ..................................................................................19

8 U.S.C. § 1229 ..................................................................................19

8 U.S.C. § 1254a ................................................................................19

8 U.S.C. § 1324 ..................................................................................20

8 U.S.C. § 1357 ..................................................................................16

8 U.S.C. § 1373 ................................................................ 12, 13, 14, 16, 23

8 U.S.C. § 1534 ..................................................................................19

8 U.S.C. § 1644 ...................................................................... 12, 13, 16

18 U.S.C. § 2721 ................................................................................19

Cal. Gov't Code § 7284.2 ...................................................................23

2025 N.M. Laws ch. 138......................................................................23

N.Y. Veh. & Traf. § 201 ................................................ 2, 20, 25, 26, 27

N.Y. Veh. & Traf. § 502 ................................................................. 1, 15

Va. Code § 46.2-208 ...........................................................................23

### *Other Authorities*

Chris Burrell, *Licensed Undocumented Immigrants May Lead to Safer Roads, Connecticut Finds*, NPR (May 24, 2019) ........................................ 6, 7, 8

Mauricio Cáceres & Kenneth P. Jameson, *The Effects on Insurance Costs of Restricting Undocumented Immigrants' Access to Driver Licenses*, S. Econ. Ass'n (Feb. 26, 2015) ...........................................................................9

Kimberly Cataudella & Alexia Fernández Campbell, Ctr. for Pub. Integrity, *Undocumented Immigrants Can Get Licenses, ICE Can Get Their Data* (July 3, 2021) ...........................................................................11

Cmty. Rel. Serv., U.S. Dep't of Just., *Importance of Police-Community Relationships and Resources for Further Reading* (2015)...................................8

Sarah E. Hendricks, Am. Immigr. Council, *Living in Car Culture Without a License* (Apr. 2014) ...........................................................................5

Highway Safety Coal., *Driver's Licenses for ALL: Economic and Safety Benefits* (Nov. 2015) ...........................................................................6

Ryan Homer, *Immigration Enforcement and Constraints on Information Commandeering*, 174 U. Pa. L. Rev. 589 (2026) ...............................................21

David Dyssegaard Kallick & Cyierra Roldan, Fiscal Pol'y Inst., *Expanding Access to Driver's Licenses* (Jan. 31, 2017).........................................................9

Sam Levin, *Police Across the US Worry Officers are Being Misidentified as ICE, Records Show*, The Guardian (Apr. 24, 2026)...........................................22

Hans Lueders et al., *Providing Driver's Licenses to Unauthorized Immigrants in California Improves Traffic Safety*, 114 Proc. of the Nat'l Acad. of Sci. 4111 (2017)...........................................................................6, 7

Kate Nash, *Expect Debate on Repeal of Immigrant Licenses in Legislative Session*, Santa Fe New Mexican (Jan. 16, 2011)....................................................9

Nat'l Highway Traffic Safety Admin., *Traffic Crashes Cost America $340 Billion in 2019* (Jan. 10, 2023) ...................................................................23

Nat'l Immigr. L. Ctr., *How U.S. Immigration & Customs Enforcement and State Motor Vehicles Departments Share Information* (May 2016) ..................11

Nat'l Immigr. L. Ctr., *Protecting State Driver's License Information* (Aug. 2025) ........................................................................................................11

Erika J. Nava, *Driver's License Expansion Would Pay For Itself and More*, N.J. Pol'y Persp. (May 28, 2019) .......................................................................9

N.Y.C. Comptroller, *The Road to Opportunity: Granting Driver's Licenses to All New Yorkers* (Jan. 2017) ................................................................. 6, 7, 8

Off. of Cmty. Oriented Policing Serv., U.S. Dep't of Just., *Building Trust Between the Police and the Citizens They Serve* (Oct. 16, 2009).........................8

Police Exec. Rsch. F., *Community-Based Identification Cards Give Immigrants a Sense of Belonging and Trust in Local Police* (June 2021)...........5

Press Release, Ill. Gov't, *Governor Quinn and President Cullerton Call for Driver's Licenses for All Illinois Motorists* (Nov. 20, 2012) ...............................9

Shannon Schumacher et al., *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement*, KFF (Nov. 18, 2025)..................................................................10

Alexandra Sirota & Lissette Guerrero, N.C. Just. Ctr., *Local Communities Face High Costs of Federal Immigration Enforcement* (Apr. 2019)................23

J. Alejandro Tirado-Alcaraz et al., Latino Pol'y Inst. Roger Williams Univ., *Issuing Driver's Licenses to Undocumented Immigrants in Rhode Island* (June 2016)................................................................................................6

Thamanna Vasan, Colo. Fiscal Inst., *The Impact of Allowing All Immigrants Access to Driver's Licenses* (Mar. 2015)...........................................................8

## INTRODUCTION AND INTEREST OF AMICI CURIAE

Amici Curiae New Jersey, the District of Columbia, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, Vermont, Virginia, and Washington (collectively, Amici States) file this brief in support of appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2). Millions of immigrants, both documented and undocumented, call Amici States home. And immigrant communities play a crucial role in Amici States' civic and economic lives. In view of that reality, Amici States have adopted different approaches to their involvement in civil immigration enforcement based on state needs, public safety priorities, and available resources. Some of these approaches expressly limit how state and local agencies use public resources to enforce federal civil immigration laws—including restrictions to safeguard the personal data that they maintain.

In 2019, New York enacted the Green Light Law, which makes all residents eligible for a state driver's license regardless of their immigration status. N.Y. Veh. & Traf. § 502(8)(b). To encourage individuals to apply for these licenses, the law strengthens privacy protections covering data maintained by New York's Department of Motor Vehicles (DMV). In particular, the Green Light Law prohibits DMV from disclosing "[a]ny portion of any record" that contains certain personal information "in response to any request for records," except where necessary to

comply with a court order, judicial warrant, or subpoena. *Id.* § 201(8). The law similarly prohibits DMV from disclosing "records or information" "to any agency that primarily enforces immigration law." *Id.* § 201(12)(a). Upon receiving a request for such personal information, the law requires DMV to "notify the individual about whom such information was requested" within three days of receiving the request. *Id.* Last, the law directs DMV's commissioner to require "any person or entity that receives or has access to records or information from the department to certify" that they "shall not … use such records or information for civil immigration purposes" or "disclose such records or information to any agency that primarily enforces immigration law." *Id.* § 201(12)(b).

Amici States file this brief to make two points. First, New York's Green Light Law reflects its reasonable determination that allowing undocumented immigrants to apply for state driver's licenses furthers public safety—and that the promise to keep their information private is critical to immigrants' willingness to obtain licenses. Second, enacting measures like the notification provision, information-sharing restriction, and certification requirement (together, "the challenged provisions") is well within States' powers. Nothing in the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, or principles of intergovernmental immunity is to the contrary, and the INA would constitute unconstitutional commandeering if it had the effect the United States claims here.

2

## SUMMARY OF ARGUMENT

1. States like New York have reasonably exercised their historic police powers to expand driving privileges to undocumented immigrants. Even the United States concedes that States may expand driving privileges in this way. And empirical evidence confirms that policies like New York's enhance public safety by reducing traffic accidents, improving policing, and increasing the number of insured drivers. Entangling state DMVs with civil immigration enforcement, however, discourages immigrants from applying for these licenses, thereby impeding States' ability to advance their public safety goals. States are thus permitted to disentangle their public safety programs from federal immigration enforcement.

2. The INA does not preempt the challenged state-law provisions. First, the information-sharing restriction and certification requirement are not expressly preempted by INA Sections 1373 and 1644. As court after court has held, the plain language of those federal provisions reaches only policies that limit the sharing of an individual's citizenship or immigration status specifically, which this law does not do. In any event, because Sections 1373 and 1644 regulate state—not private—actors, they are not valid preemption provisions under *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). Second, the notification provision does not stand as an obstacle to the implementation of federal immigration law. Nothing in the INA prohibits States from adopting reasonable privacy protections to

3

safeguard the personal information they collect and maintain. Finding preemption here would be especially unwarranted given the potential infringement on States' historic police powers and the absence of "clear and manifest" textual indicia of preemption.

Finally, adopting the United States' broad interpretation of the INA would amount to unconstitutional commandeering and create the very harms that the anticommandeering rule aims to prevent. Here, preemption would blur the lines of state and federal political accountability and shift the costs of civil immigration enforcement to the States. The Constitution does not countenance that result.

3. The challenged provisions do not violate intergovernmental immunity principles either. For one, the provisions do not discriminate against the federal government because they are facially neutral and do not single out the federal government for unfavorable treatment. The United States has not identified a similarly situated comparator that the State treats differently—and drawing a line between criminal enforcement and civil immigration enforcement does not demonstrate discrimination merely because the federal government performs the latter. Moreover, the certification requirement does not directly regulate the federal government because it directs the conduct of state, not federal, officials.

## ARGUMENT

**I.  States Have Reasonably Exercised Their Police Powers To Make Policy Decisions That Enhance The Safety Of Their Roads.**

The regulation of safety "is primarily a state function, whether the locus be private property or the public highways." *Bradley v. Pub. Utilities Comm'n of Ohio*, 289 U.S. 92, 95 (1933).  A core component of this function is the training and credentialing of all drivers.  Requiring "drivers [to] pass a test to ensure they know and understand the rules of operating a motor vehicle on the roadways" "promotes public safety and accountability."  Police Exec. Rsch. F., *Community-Based Identification Cards Give Immigrants a Sense of Belonging and Trust in Local Police* 11 (June 2021), https://perma.cc/2MNC-9Y6B.  Accordingly, allowing undocumented immigrants to apply for driver's licenses and removing hurdles for them to do so can enhance traffic safety and benefit drivers.  *See* Sarah E. Hendricks, Am. Immigr. Council, *Living in Car Culture Without a License* 7 (Apr. 2014), https://perma.cc/8R9J-4KFA ("The exclusion of unauthorized immigrants from … proper road safety and driving tests[] is likely to result in more dangerous roads and higher costs for insured drivers.").

Although different States have taken different approaches to ensuring the safety of their roads, ample empirical evidence demonstrates that laws like New York's can enhance public safety.  A 2016 study found that States permitting undocumented immigrants to apply for driver's licenses "have on average less traffic

5

fatalities" than States requiring applicants to demonstrate their immigration status. J. Alejandro Tirado-Alcaraz et al., Latino Pol'y Inst. Roger Williams Univ., *Issuing Driver's Licenses to Undocumented Immigrants in Rhode Island* 21 (June 2016), https://perma.cc/6TL2-L4TQ.  For example, since New Mexico began issuing state driver's licenses to undocumented immigrants, the State has observed a drop in "alcohol-related crashes … and traffic fatalities" by 32% and 23%, respectively. Highway Safety Coal., *Driver's Licenses for ALL: Economic and Safety Benefits* 1 (Nov. 2015), https://perma.cc/8HCD-MFM6.  Utah's traffic fatality rate similarly "fell by 23 percent between 2005 and 2012," following the State's expansion of driving privileges to undocumented immigrants.  N.Y.C. Comptroller, *The Road to Opportunity: Granting Driver's Licenses to All New Yorkers* 8 (Jan. 2017), https://perma.cc/35MH-27JN.

One key public safety benefit of laws like New York's is the associated decline in hit-and-run incidents.  Indeed, California experienced "an annual decline in hit and run accidents by about 4,000" crashes after it began issuing state licenses to undocumented immigrants, which saved non-at-fault drivers "out of pocket expenses for car repairs (physical damage) of about $3.5 million."  Hans Lueders et al., *Providing Driver's Licenses to Unauthorized Immigrants in California Improves Traffic Safety*, 114 Proc. of the Nat'l Acad. of Sci. 4111, 4115 (2017), https://perma.cc/6EKW-HWP8; *see also* Chris Burrell, *Licensed Undocumented*

*Immigrants May Lead to Safer Roads, Connecticut Finds*, NPR (May 24, 2019), https://perma.cc/PG8W-4K4N (documenting a drop in hit-and-run crashes by 9% in a two-year period). This is partially explained by the fact that undocumented immigrants with valid driver's licenses will not be charged with unlicensed driving and are therefore "less likely to flee a crash." Burrell, *supra*; *see also* Lueders, *supra* at 4115 (explaining that licensed undocumented immigrants "have weaker incentives to flee the scene after an accident[] because they are less likely to fear deportation"). Reducing the number of hit-and-run accidents is central to advancing public safety because "serious injuries and fatalities become more likely when a driver leaves the scene of an accident without helping victims or reporting the incident to the authorities." Lueders, *supra* at 4111-12; *see also id.* (delay increases fatality risk "because most deaths in traffic collisions occur within the first 60 minutes after the accident").

Policies that permit undocumented immigrants to seek driver's licenses can further promote public safety by improving policing. To start, these policies "help build trust between local police and immigrant communities" by allowing undocumented immigrants to "feel more at ease communicating with police officers during traffic stops." *The Road to Opportunity*, *supra* at 8-9. Community trust is essential because "[p]olice officials rely on the cooperation of community members" to report crimes and provide critical information about public-safety incidents.

Cmty. Rel. Serv., U.S. Dep't of Just., *Importance of Police-Community Relationships and Resources for Further Reading* 1 (2015), https://perma.cc/43K8-ANWC; Off. of Cmty. Oriented Policing Serv., U.S. Dep't of Just., *Building Trust Between the Police and the Citizens They Serve* 3 (Oct. 16, 2009), https://perma.cc/L6TJ-REK8 (community trust is the "cornerstone" of "successful policing and law enforcement"). In addition, these policies can improve policing by "saving officers time when issuing routine citations," Burrell, *supra*, thereby allowing law enforcement officers to focus their limited time and resources on other public safety priorities.

Furthermore, laws like New York's can improve the rate of insurance coverage, thereby benefiting all drivers. For instance, the rate of uninsured vehicles in New Mexico "decreased [by] almost 24 percentage points, from 33 percent in 2002 to 9.1 percent in 2011" after the State began issuing driver's licenses to undocumented immigrants. Thamanna Vasan, Colo. Fiscal Inst., *The Impact of Allowing All Immigrants Access to Driver's Licenses* 2 (Mar. 2015), https://perma.cc/8CTQ-PC6Z. Likewise, in Utah—a State that grants driving privileges regardless of immigration status—only 5.8% of motorists are uninsured, "which is less than half of the national average of 12.6%." *The Road to Opportunity*, *supra* at 8. Improving insurance coverage rates is not only "a major benefit" to drivers involved in car accidents, David Dyssegaard Kallick & Cyierra Roldan,

8

Fiscal Pol'y Inst., *Expanding Access to Driver's Licenses* 5 (Jan. 31, 2017), https://perma.cc/ADX6-KYHL, it also decreases the cost of insurance premiums for all drivers, *see, e.g.*, Mauricio Cáceres & Kenneth P. Jameson, *The Effects on Insurance Costs of Restricting Undocumented Immigrants' Access to Driver Licenses*, S. Econ. Ass'n (Feb. 26, 2015); Press Release, Ill. Gov't, *Governor Quinn and President Cullerton Call for Driver's Licenses for All Illinois Motorists* (Nov. 20, 2012), https://perma.cc/7926-XNL6 (Illinois Highway Safety Coalition projects that licensing half of the estimated 250,000 unlicensed immigrants "would save an estimated $46 million a year in premium payments").

Last, promoting undocumented immigrants' access to driver's licenses can also benefit the local economy through the collection of registration fees and tax revenue. The sponsor of New Mexico's law estimated that the policy brought "$500 million in economic impact to the state" through "license fees, insurance premiums[,] and car sales" in the ten-year period following its enactment. Kate Nash, *Expect Debate on Repeal of Immigrant Licenses in Legislative Session*, Santa Fe New Mexican (Jan. 16, 2011), https://perma.cc/C6D2-5WDT. Other States with similar policies expect comparable financial benefits. *See, e.g.*, Erika J. Nava, *Driver's License Expansion Would Pay For Itself and More*, N.J. Pol'y Persp. (May 28, 2019), https://perma.cc/KVU5-WX54 (estimating that New Jersey's "driver's license expansion is projected to generate $21 million in revenue from permit, title,

9

and driver's license fees" in the first three years of implementation, and, once fully implemented, "will generate $90 million annually from registration fees, the gas tax, and … sales tax").

Entangling state DMVs with civil immigration enforcement, however, discourages immigrants from applying for these licenses, particularly in light of the federal government's recently increased enforcement of civil immigration laws. Anxiety about immigration enforcement is widespread among both documented and undocumented immigrants: a 2025 survey found that nearly 53% of Hispanic immigrants worry that they or a family member could be detained or deported, "up from 41% in 2023." Shannon Schumacher et al., *KFF/New York Times 2025 Survey of Immigrants: Worries and Experiences Amid Increased Immigration Enforcement*, KFF (Nov. 18, 2025), https://perma.cc/HX24-4XX3. This fear affects how immigrant communities participate in civic society and interact with their state and local governments. Indeed, that same survey found that "[a]cross immigration statuses, larger shares of immigrants now than in 2023" reported that they "have avoided things like talking to the police, applying for a job, or traveling" due to their or a family member's immigration status. *Id.*

If state DMVs do not protect the personal data they collect, there is strong reason to think immigrant communities will be less likely to apply for these licenses. This is so because "many immigrants are concerned that any information provided

10

to state driver's license agencies will be shared with U.S. Immigration and Customs Enforcement (ICE)." Nat'l Immigr. L. Ctr., *How U.S. Immigration & Customs Enforcement and State Motor Vehicles Departments Share Information* 1 (May 2016), https://perma.cc/A9TD-HWZD. In Utah, for example, "increased fear about what the government will do with information has kept some undocumented immigrants from applying for driving privilege cards." Kimberly Cataudella & Alexia Fernández Campbell, Ctr. for Pub. Integrity, *Undocumented Immigrants Can Get Licenses, ICE Can Get Their Data* (July 3, 2021), https://perma.cc/3ULM-JUD9. This explains why so many States have adopted privacy protections similar to New York's. *See* Nat'l Immigr. L. Ctr., *Protecting State Driver's License Information* 5-10 (Aug. 2025), https://perma.cc/ZR2P-64JK (identifying state laws with similar confidentiality provisions). At bottom, States like New York have reasonably concluded that policies that disentangle their DMVs from civil immigration enforcement will improve resident immigrants' willingness to apply for these licenses and thus achieve these concomitant public safety benefits.

## II. Federal Immigration Law Does Not Preempt The Challenged Provisions.

The Supreme Court has identified three types of preemption—"express," "conflict," and "field" preemption. *Murphy*, 584 U.S. at 477 (citing *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990)). Congress can preempt state law expressly by "defin[ing] explicitly the extent to which its enactments" preempt the law. *English*,

496 U.S. at 78. Conflict preemption, for its part, arises only where "local law conflicts with federal law such that it is impossible for a party to comply with both," *Grand River Enter. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 126 (2d Cir. 2021) (internal quotation marks omitted), or where the state law poses an obstacle to the full effectuation of the federal statute's "text and structure," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (internal quotation marks omitted). In assessing whether a state law in fact is an obstacle to a federal statute, courts "start with the assumption that the historic police powers of the States [are] not to be superseded" by federal law "unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

In this case, the United States raises several objections to the challenged provisions of the Green Light Law. First, the United States contends that the law's information-sharing restriction and certification requirement "expressly conflict[]" with Sections 1373 and 1644 of the INA, U.S. Br. 25, 37-38, which purport to preclude States from adopting policies to prohibit or restrict sharing "information regarding the citizenship or immigration status" of individuals, 8 U.S.C. § 1373(a); *see id.* § 1644. Second, the United States claims that the notification provision "erect[s] an obstacle to the enforcement of federal immigration law" by

12

"interfer[ing] with federal investigations" and "impos[ing] untenable burdens on the free flow of information between state and federal officials." U.S. Br. 16, 18.

Both challenges lack merit. With respect to the first, Sections 1373 and 1644 are far narrower provisions than the United States contends—they do not preempt policies that limit information sharing with respect to information other than an individual's citizenship or immigration status. In any event, those INA provisions are not valid preemption provisions because they regulate state, not private conduct. As for the conflict preemption challenge, nothing in the INA prohibits States from adopting privacy protections covering the personal data they collect. A finding of preemption would be particularly unwarranted here, given the potential infringement on States' historic police powers and the lack of a "clear and manifest" congressional intent to preempt. After all, Congress enacted several of its own notification provisions within the INA, and privacy protections are common in state law. *See* U.S. Br. 4; N.Y. Br. 35-37. In addition, as a matter of constitutional avoidance, the INA as construed by the United States would run afoul of the anticommandeering rule.

### A. Federal immigration law does not expressly preempt the information-sharing restriction and certification requirement.

The United States first contends that several provisions of the INA, 8 U.S.C. §§ 1373, 1644, expressly preempt the information-sharing restriction and certification requirement of New York's Green Light Law.

13

To begin, INA Sections 1373 and 1644 are narrow provisions: they do not preempt policies that limit information sharing with respect to information other than an individual's citizenship or immigration status. In cases of express preemption, the court's inquiry "focus[es] on the plain wording" of the preemption clause, "which necessarily contains the best evidence of Congress' preemptive intent." *Chamber of Com. v. Whiting*, 563 U.S. 582, 594 (2011) (plurality) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). The INA provisions concern restrictions on sharing information "regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373, which "is naturally understood as a reference to a person's legal classification under federal law," *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019), rather than all personal information about an individual. The information-sharing restriction and certification requirement at issue here limit information sharing with respect to DMV records, such as individuals' telephone number, place of birth, or place of employment—information that "does not directly relate to, or regard, an individual's immigration status." *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 376 (D.N.J. 2020). Congress has not expressed an intent to preempt provisions restricting sharing such information, and courts have repeatedly rejected the United States' overly broad reading of Sections 1373 and 1644. *See, e.g.*, *California*, 921 F.3d at

14

891; *United States v. Illinois*, 796 F. Supp. 3d 494, 516 (N.D. Ill. 2025); *County of Ocean*, 475 F. Supp. 3d at 376.

Furthermore, the United States does not demonstrate how those narrow INA provisions expressly preempt New York's certification requirement—which concerns how third-party requestors may or may not use DMV records. Nor does the United States explain how the INA provisions apply to the information maintained by New York's DMV, particularly given state law prohibits the agency from "inquir[ing] about the citizenship or immigration status of any applicant" for a state driver's license. N.Y. Veh. & Traf. § 502(8)(e)(ii).

In any event, Sections 1373 and 1644 are not valid preemption provisions because they regulate state, not private actors. Because the Constitution "confers upon Congress the power to regulate individuals, not States," *New York v. United States*, 505 U.S. 144, 166 (1992), a preemptive federal law "must be best read as one that regulates private actors," *Murphy*, 584 U.S. at 477. Indeed, "every form of preemption is based on a federal law that regulates the conduct of private actors" because a federal law that directly regulates States would raise Tenth Amendment concerns and hence be void. *Id.* at 479. But "there is no way" in which these INA provisions "can be understood as a regulation of private actors." *Id.* at 479-80. For example, Section 1373 expressly orders "Federal, State, or local government entit[ies] or official[s]" not to restrict certain forms of information sharing with the

15

Immigration Naturalization Service. 8 U.S.C. § 1373(a); *see id.* § 1644 (directing "State or local government entit[ies]"). This provision "is a clear prohibition on *state* action," *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176, 182 (3d Cir. 2021), and does not "impose any federal restrictions on private actors," *Murphy*, 584 U.S. at 480.

Nor do the INA provisions "confer any federal rights" on private persons. *Id.* Whether States share certain information with federal immigration agents has no bearing on an individual's citizenship or immigration status, nor does it provide the individual with any new rights or obligations. That is fatal to the government's preemption claim. *Ocean County*, 8 F.4th at 182 (finding the fact that 8 U.S.C. § 1373 regulates exclusively state and local governments disposes of preemption).

These points are further buttressed by other INA provisions, such as 8 U.S.C. § 1357(g), which explicitly leaves to States the discretion to decide whether to assist immigration enforcement efforts. *See id.* § 1357(g)(9) ("Nothing in this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement."); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). Moreover, the INA states that agreements under Section 1357(g) can be carried out only "to the extent consistent with State and local law," 8 U.S.C. § 1357(g)(1), which means "some state and local regulation of cooperation is permissible," *City of El Cenizo*, 890 F.3d at 178; *see*

16

*also id.* (federal law "does not suggest the intent—let alone a 'clear and manifest' one—to prevent [S]tates from regulating" the decision to enter such agreements). Thus, the INA contemplates that States have wide leeway in deciding the extent to which they will participate in federal immigration enforcement efforts.

**B.      The notification provision does not stand as an obstacle to the implementation of federal immigration law.**

Under the doctrine of conflict preemption, federal law impliedly preempts a state law only when the state law poses an obstacle to the full effectuation of a federal statute's "text and structure." *Garcia*, 589 U.S. at 208. This is not a "freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *id.* at 202 (internal quotation marks omitted), for "such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law,'" *Whiting*, 563 U.S. at 607 (citation omitted). Rather, courts impose a "high threshold" for obstacle preemption, *id.*, finding an obstacle to the implementation of federal law only where "the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together," *Williams v. Marinelli*, 987 F.3d 188, 198-99 (2d Cir. 2011) (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Litig.*, 725 F.3d 65, 102 (2d Cir. 2013)). So "[i]nvoking some brooding federal interest" is not enough to support a preemption claim. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (op. of Gorsuch, J.).

This Court's preemption analysis must "begin … with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (internal quotation marks omitted), an assumption that "applies with particular force when Congress has legislated in a field traditionally occupied by the States," *id.* Because our decentralized system of federalism "secures to citizens the liberties that derive from the diffusion of sovereign power," *New York*, 505 U.S. at 181 (citation omitted), "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers," *Bond v. United States*, 572 U.S. 844, 858 (2014) (internal quotation marks omitted).

That presumption applies here because the "[p]rotection against accidents, as against crime, presents ordinarily a local problem," and is therefore "primarily a state function." *Bradley*, 289 U.S. at 95; *Kane v. New Jersey*, 242 U.S. 160, 167 (1916) (acknowledging "[t]he power of a state to regulate the use of motor vehicles on its highways"). Regulating the issuance of driver's licenses "is governed almost exclusively by state law," *Kearns v. Cuomo*, 981 F.3d 200, 204 (2d Cir. 2020), because it is central to States' authority to monitor and promote the safety of their roads, *cf. United States v. Snyder*, 852 F.2d 471, 475 (9th Cir. 1988) ("Drivers' licenses are issued pursuant to the [S]tates' police powers."). New York has

18

reasonably determined that it can more effectively promote traffic safety by removing barriers for undocumented immigrants to seek driver's licenses and by disentangling its state driver's licensing system from civil immigration enforcement. The challenged provisions fall appropriately within the historic police power of New York and thus merit the presumption against preemption.

The United States has not met the high threshold of demonstrating that Congress' "clear and manifest purpose" was to override the historic right of States to carry out their driver's licensing systems and limit their assistance with federal immigration enforcement, including by furnishing notice when the State provides immigration officials with a resident's personal information. *Altria*, 555 U.S. at 77 (internal quotation marks omitted). Instead, the United States merely contends that "federal law does not contemplate that aliens will be warned when they are being investigated." U.S. Br. 17. No provision in the INA, however, prohibits States from notifying individuals when state agencies are asked to disclose their personal information. In fact, federal law expressly requires state DMVs to protect the personal data they collect and maintain. *See* 18 U.S.C. § 2721(a). In addition, laws requiring entities to notify individuals when their data has been requested by third parties are widely prevalent. *See* N.Y. Br. 35-36. And federal law *itself* requires immigrants to be furnished with notice of charges in certain circumstances. *See* U.S. Br. 4 (discussing 8 U.S.C. §§ 1228, 1229, 1254a, 1534).

19

Nor does the United States explain how the notification provision obstructs the federal government's enforcement of civil immigration law beyond merely asserting that it "interfere[s] with federal investigations." *Contra* U.S. Br. 18. The notice that DMV provides to individuals does not disclose any sensitive information about the nature of the federal government's investigation; it merely "inform[s] [the] individual of the request and the identity of the agency that made such request." N.Y. Veh. & Traf. § 201(12)(a). To the extent that the United States argues that DMV's enforcement of the notification provision constitutes harboring under 8 U.S.C. § 1324(a)(1)(A)(iii), that argument is foreclosed by this Court's decision in *Kearns*, which explained that "compliance with the Green Light Law does not require" state employees to engage in any harboring activities. 981 F.3d at 208.

Moreover, the notification provision does not "impose[] untenable burdens on the free flow of information between state and federal officials." *Contra* U.S. Br. 18. Federal immigration officials may still access personal data maintained by DMV through "a lawful court order or judicial warrant." N.Y. Veh. & Traf. § 201(12)(a). That the notification provision may "make[] the jobs of federal immigration authorities more difficult" is insufficient for purposes of demonstrating obstacle preemption. *California*, 921 F.3d at 886. Rather, obstacle preemption requires a clear conflict with the statute's "text and structure." *Garcia*, 589 U.S. at 208. The mere "possibility that federal enforcement priorities might be upset is not enough to

20

provide a basis for preemption" because the Supremacy Clause "gives priority to 'the laws of the United States,' not the … law enforcement priorities or preferences of federal officers." *Id.* at 212 (quoting U.S. Const. art. VI, cl. 2). The INA does not forbid these types of privacy protections, so the notification provision is well within New York's police powers.

### C. Interpreting the INA to preempt the challenged provisions would amount to unconstitutional commandeering.

Even if the INA could be read to preempt the challenged provisions, such an interpretation would "run[] directly afoul of the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891. The anticommandeering doctrine is "the expression of a fundamental structural decision incorporated into the Constitution, i.e., the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470. Because States have every right in our federalist system to pursue their own policies, direct federal "commands are fundamentally incompatible with our constitutional system of dual sovereignty." *Printz v. United States*, 521 U.S. 898, 935 (1997). Indeed, the anticommandeering rule protects "the exact types of decisions that [these] jurisdictions have made: the right *not* to participate in federal regulatory schemes." Ryan Homer, *Immigration Enforcement and Constraints on Information Commandeering*, 174 U. Pa. L. Rev. 589, 592 (2026); *see also New York*, 505 U.S. at 176-77 (holding that a federal law violated the anticommandeering doctrine because it took away the State's right to

21

"decline to administer [a] federal program"). Courts have repeatedly construed federal law in similar contexts to avoid commandeering concerns. *See, e.g.*, *McHenry County v. Raoul*, 44 F.4th 581, 590 n.4 (7th Cir. 2022) (interpreting INA sections 1103(a)(11)(B) and 1231(g) to contemplate cooperative agreements between federal and state government because a contrary reading "would raise … constitutional questions under the anticommandeering doctrine").

Adopting the United States' interpretation of the INA would create the very harms the anticommandeering rule aims to prevent. To start, the anticommandeering rule "promotes political accountability" by making it clear to voters "who to credit or blame" for governmental action. *Murphy*, 584 U.S. at 473; *see New York*, 505 U.S. at 169 ("[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials … remain insulated."). If a state or local government participates in federal immigration enforcement "only because it has been commanded to do so by Congress," then responsibility for immigration enforcement "is blurred." *Murphy*, 584 U.S. at 473-74. This blurring of roles and responsibilities is not hypothetical. *See, e.g.*, Sam Levin, *Police Across the US Worry Officers are Being Misidentified as ICE, Records Show*, The Guardian (Apr. 24, 2026), https://perma.cc/89YR-8YT5. Several States have passed similar policies to expressly create separation between their safety priorities and distinct federal policies. *See, e.g.*, Cal. Gov't Code

22

§ 7284.2(d) ("Entangling state and local agencies with federal immigration enforcement programs … blurs the line of accountability between local, state, and federal governments."); 2025 N.M. Laws ch. 138; Va. Code § 46.2-208. These choices should not be undermined.

The anticommandeering rule also "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 474. Participating in federal immigration enforcement imposes significant costs on States, and these costs can be both immediate and direct. For example, one study found that North Carolina's involvement in civil immigration enforcement cost taxpayers "at least $81.7 million" over a decade. Alexandra Sirota & Lissette Guerrero, N.C. Just. Ctr., *Local Communities Face High Costs of Federal Immigration Enforcement* 4 (Apr. 2019), https://perma.cc/5FGV-PFV2. Furthermore, States also suffer the costs of unsafe roads and higher incidents of car accidents. *See supra* pp. 5-10; *see also* Nat'l Highway Traffic Safety Admin., *Traffic Crashes Cost America $340 Billion in 2019* (Jan. 10, 2023), https://perma.cc/LE89-FFUB (detailing the cost of traffic accidents on taxpayers). The INA must not be construed, whether by conflict or express preemption, to produce unconstitutional commands.

Second Circuit precedent is not to the contrary. The United States contends that the Second Circuit "has already rejected a Tenth Amendment challenge to 8 U.S.C. § 1373," U.S. Br. 26, citing the court's decisions in *City of New York v.*

23

*United States*, 179 F.3d 29 (2d Cir. 1999), and *New York v. Department of Justice*, 951 F.3d 84 (2d Cir. 2020).  But those two decisions do not control here.  For one, *City of New York* predates the Supreme Court's seminal anticommandeering decision in *Murphy*, which explained clearly that a federal law that "unequivocally dictates what a state legislature may *and may not* do" violates the Tenth Amendment anticommandeering rule.  *Murphy*, 584 U.S. at 474 (emphasis added); N.Y. Br. 43.  That decision thus effectively overruled the Second Circuit's decision in *City of New York*.  As for *New York v. DOJ*, that case's holding concerned the constitutionality of Section 1373 only as applied to a federal funding requirement that States had a legitimate opportunity to decline to abide by if they refused the funds.  951 F.3d at 114-15.  It is hornbook law that merely because some requirement can be included in a funding condition does not mean it can be commanded by the federal government.  *New York*, 505 U.S. at 176.

III.    **The Challenged Provisions Do Not Violate Intergovernmental Immunity Principles.**

The intergovernmental immunity doctrine prohibits "state laws that *either* 'regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals.'"  *United States v. Washington*, 596 U.S. 832, 838 (2022) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion).  The United States claims that the challenged provisions violate principles of intergovernmental immunity in two ways.  First, it contends that the certification

24

requirement "improperly regulates the federal government." U.S. Br. 33. Next, it maintains that the challenged provisions "unlawfully discriminate[]" by "singl[ing] out federal immigration officials for less favorable treatment." U.S. Br. 22-24, 29-30, 36-37. Both challenges lack merit because the challenged provisions are facially neutral and do not directly regulate the conduct of federal officials.

*First*, the certification requirement does not improperly regulate the federal government because it applies to state, not federal, officials. The intergovernmental immunity doctrine does not "bar[] all state regulation which may touch the activities of the Federal Government." *Hancock v. Train*, 426 U.S. 167, 179-80 (1976). A state law "is invalid only if it regulates the United States directly." *North Dakota*, 495 U.S. at 435. The certification requirement "imposes no direct regulation on any federal official or agency." *McHenry County*, 44 F.4th at 593. Rather, it directs the actions of DMV's commissioner by requiring *him* to obtain a certification before turning over records, N.Y. Veh. & Traf. § 201(12)(b), and imposes only an incidental burden on the ability of federal officials to carry out their duties, *see* N.Y. Br. 52-53; *see also California*, 921 F.3d at 880 (finding no violation of intergovernmental immunity where the challenged law is "directed at the conduct of *employers*, not the United States or its agents" and the actions of the federal government are only "incidentally" burdened). Nor does the certification

25

requirement "interfere with or dictate federal decisions." *See supra* pp. 17-21; *see also Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 762 (9th Cir. 2025).

*Second*, the challenged provisions do not impermissibly discriminate against the federal government. A state law discriminates against the federal government if it "singles [it] out for less favorable treatment." *Washington*, 596 U.S. at 839 (citation modified). But a law is not unconstitutional merely because it "indirectly increases costs for the federal government," so long as it does so "in a neutral, nondiscriminatory way." *Id.* Start with the certification requirement. That provision is facially neutral: it applies to "any person or entity that receives or has access to records or information" from DMV. N.Y. Veh. & Traf. Law § 201(12)(b). Furthermore, the Green Light Law evenhandedly imposes information-sharing restrictions on data requests made by state and federal agencies. Section 201(12)(a)—the challenged information-sharing restriction—prohibits DMV from disclosing "records or information" it maintains "to any agency that primarily enforces immigration law," *id.* § 201(12)(a), but an earlier provision similarly prohibits the state agency from disclosing "[a]ny portion of any record" that contains certain personal information "in response to any request" by essentially any person, except where necessary to comply with a court order, *id.* § 201(8). Although the United States contends that Section 201(8) allows for the disclosure of "at least some

26

additional information" that Section 201(12) prohibits, U.S. Br. 29, it does not identify such information.

Moreover, the challenged notification provision and information-sharing restriction do not single out the federal government for unfavorable treatment but instead apply with respect to requests "from an agency that primarily enforces immigration law." N.Y. Veh. & Traf. § 201(12)(a). For one, the United States does not identify a specific "similarly situated" state or local law enforcement agency that raises the same concerns for the State and that the provisions treat more favorably than the federal government. *Washington*, 596 U.S. at 839. To the extent the United States argues that the challenged provisions discriminate against the federal government merely because they "affect[] an exclusively federal domain, that argument [also] fails." *McHenry County*, 44 F.4th at 594; *see Washington v. United States*, 460 U.S. 536, 544-45 (1983) (a State does not discriminate against the federal government "unless it treats someone else better than it treats them").

Furthermore, it would be particularly odd to say that the challenged provisions violate the intergovernmental immunity doctrine when federal law *itself* authorizes States and local governments to decline to enter into cooperative agreements to enforce federal immigration law. *See supra* pp. 16-17; *McHenry County*, 44 F.4th at 594 n.7 ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute

27

discrimination against the federal government."). And the United States' approach to intergovernmental immunity in any event cannot withstand the Tenth Amendment, which ensures that the "Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz*, 521 U.S. at 935. If a State must assist in the enforcement of federal immigration policy because anything else is somehow deemed discriminatory, then States would be subject to the very command that the Constitution's anticommandeering principle abhors.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

| | |
|---|---|
| BRIAN L. SCHWALB<br>Attorney General<br>District of Columbia | JENNIFER DAVENPORT<br>Attorney General<br>State of New Jersey |
| CAROLINE S. VAN ZILE<br>Solicitor General | JEREMY M. FEIGENBAUM<br>Solicitor General |
| ASHWIN P. PHATAK<br>Principal Deputy Solicitor General | /s/ Benjamin M. Shultz<br>BENJAMIN M. SHULTZ<br>Assistant Attorney General |
| 400 6th Street, NW, Suite 8100<br>Washington, D.C. 20001<br>(202) 724-6609<br>caroline.vanzile@dc.gov | 25 Market Street, Box 080<br>Trenton, NJ 08625<br>(609) 728-5207<br>benjamin.shultz@njoag.gov |

August 2026

28

On behalf of:

ROB BONTA
Attorney General
State of California

PHILIP J. WEISER
Attorney General
State of Colorado

WILLIAM TONG
Attorney General
State of Connecticut

KATHLEEN JENNINGS
Attorney General
State of Delaware

ANNE E. LOPEZ
Attorney General
State of Hawaii

KWAME RAOUL
Attorney General
State of Illinois

AARON M. FREY
Attorney General
State of Maine

ANTHONY G. BROWN
Attorney General
State of Maryland

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

KEITH ELLISON
Attorney General
State of Minnesota

AARON D. FORD
Attorney General
State of Nevada

RAÚL TORREZ
Attorney General
State of New Mexico

DAN RAYFIELD
Attorney General
State of Oregon

PETER F. NERONHA
Attorney General
State of Rhode Island

CHARITY R. CLARK
Attorney General
State of Vermont

JAY JONES
Attorney General
Commonwealth of Virginia

NICHOLAS W. BROWN
Attorney General
State of Washington

29

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1. The brief contains 6,337 words, including all headings, footnotes, and quotations, and excluding the parts exempted under Federal Rule of Appellate Procedure 32(f). I certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Benjamin M. Shultz
BENJAMIN M. SHULTZ

## CERTIFICATE OF SERVICE

I certify that on August 5, 2026, I electronically filed this brief with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using the ACMS system.  Counsel of record for all parties are registered users and will be served by the appellate ACMS system.


/s/ Benjamin M. Shultz
BENJAMIN M. SHULTZ