# No. 26-387

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

STATE OF NEW YORK, KATHLEEN HOCHUL, *Governor of New York, in her Official Capacity*, LETITIA JAMES, *Attorney General of New York, in her Official Capacity*, MARK J.F. SCHROEDER, *Commissioner of the New York State Department of Motor Vehicles, in his Official Capacity*,

Defendants-Appellees.

On Appeal from the United States District Court
for the Northern District of New York

**REPLY BRIEF FOR APPELLANT UNITED STATES OF AMERICA**

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The Green Light Law's Tip-Off Requirement Violates the Supremacy Clause ........ 2

  A. The Tip-Off Requirement Is Preempted ........ 2

  B. The Tip-Off Requirement Improperly Discriminates Against the Federal Government ........ 10

II. The Green Light Law's Information-Sharing Restriction Violates the Supremacy Clause ........ 13

  A. The Information-Sharing Restriction Is Preempted ........ 14

  B. The Information-Sharing Restriction Improperly Discriminates Against the Federal Government ........ 20

III. The Green Light Law's Certification Requirement Violates the Supremacy Clause ........ 20

  A. The Certification Requirement Directly Regulates the Federal Government ........ 21

  B. The Certification Requirement Improperly Discriminates Against the Federal Government ........ 24

  C. The Certification Requirement Is Preempted ........ 25

CONCLUSION ........ 26

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Arizona v. United States*,
567 U.S. 387 (2012) .................... 2, 4-5, 6, 16

*Boeing Co. v. Movassaghi*,
768 F.3d 832 (9th Cir. 2014) .................... 12

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) .................... 8

*California Coastal Comm'n v. Granite Rock Co.*,
480 U.S. 572 (1987) .................... 15, 16

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) .................... 1, 9, 18-19

*DCC Propane, LLC v. KMT Enters., Inc.*,
147 F.4th 171 (2d Cir. 2025) .................... 20

*GEO Grp., Inc. v. Inslee*,
151 F.4th 1107 (9th Cir. 2025) .................... 23

*GEO Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) (en banc) .................... 8, 20

*Hancock v. Train*
426 U.S. 167 (1976) .................... 21, 23

*Intel Corp. Inv. Policy Comm. v. Sulyma*,
589 U.S. 178 (2020) .................... 17

*Jin v. Metropolitan Life Ins. Co.*,
310 F.3d 84 (2d Cir. 2002) .................... 12, 13

*Johnson v. Maryland*,
254 U.S. 51 (1920) .................... 22

*Kansas v. Garcia*,
589 U.S. 191 (2020) .................... 5

*Lamar, Archer & Cofrin, LLP v. Appling*,
584 U.S. 709 (2018) .................... 17

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir. 2022) ........ 11, 23, 24

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013) ........ 4

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ........ 9, 19

*New York v. Department of Just.*,
951 F.3d 84 (2d Cir. 2020) ........ 9, 18, 19

*New York v. United States*,
505 U.S. 144 (1992) ........ 9

*Nwauzor v. GEO Grp., Inc.*,
127 F.4th 750 (9th Cir. 2025) ........ 23

*Ocean Cnty. Bd. of Comm'rs v. Attorney Gen.*,
8 F.4th 176 (3d Cir. 2021) ........ 19

*Printz v. United States*,
521 U.S. 898 (1997) ........ 9, 20

*Rudisill v. McDonough*,
601 U.S. 294 (2024) ........ 17

*United States ex rel. Polansky v. Executive Health Res., Inc.*,
599 U.S. 419 (2023) ........ 17

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) ........ 23

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ........ 11

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) ........ 15

*United States v. King County*,
122 F.4th 740 (9th Cir. 2024) ........ 11

*United States v. Washington*,
596 U.S. 832 (2022) ........ 1, 10, 20

*United States v. Young*,
998 F.3d 43 (2d Cir. 2021) ........ 12-13

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) (plurality opinion) ........ 5

**Federal Statutes**

8 U.S.C. § 1226 ........ 4

8 U.S.C. § 1226a ........ 4

8 U.S.C. § 1227 ........ 4

8 U.S.C. § 1360 ........ 17

8 U.S.C. § 1373 ........ 9, 13-19, 25

8 U.S.C. § 1644 ........ 13

**State Statutes**

N.Y. Penal Law § 70.00 ........ 21

N.Y. Veh. & Traf. Law § 201 ........ 2, 13, 16, 21

N.Y. Veh. & Traf. Law § 502 ........ 14

N.Y. Veh. & Traf. Law § 508 ........ 13, 16

**Rules**

Fed. R. Civ. P. 15 ........ 12

**Other**

N.Y. Assembly Debate on Bill A3675B (June 12, 2019) ........ 7

N.Y. Senate Debate on Bill A3675B (June 17, 2019) ........ 1, 8

## INTRODUCTION

The State of New York may be authorized to provide its citizens with standard, not-for-federal-purposes driver's licenses, but while purporting to exercise that authority, it cannot "frustrate[] federal programs," *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999), or violate the doctrine of intergovernmental immunity, *United States v. Washington*, 596 U.S. 832, 838 (2022). Through the Green Light Law, New York did exactly that. It enacted three provisions with the purpose and effect of interfering with federal enforcement of federal immigration law. Those provisions conflict with federal law, single out the federal government for differential treatment, and regulate how federal officers perform their federal functions. This suit is about those specific provisions, which cannot withstand scrutiny under the Supremacy Clause, not New York's general authority to regulate state driver's licenses.

Nevertheless, defendants spend much of their brief defending the Green Light Law as regulating driver's licenses, ensuring public safety, and protecting data privacy. Those arguments are largely beside the point. The Tip-Off Requirement, Information-Sharing Restriction, and Certification Requirement each go beyond any legitimate interest New York might have. As a sponsor of the law recognized, "the objective of the [Green Light Law] is to protect people from immigration enforcement." N.Y. Senate Debate on Bill A3675B, at 5958 (June 17, 2019), https://perma.cc/E928-5FTY (Luis R. Sepúlveda). That is not a legitimate interest, and the particular means

defendants have employed to achieve it are inconsistent with federal law. This Court should reverse.

## ARGUMENT

### I. The Green Light Law's Tip-Off Requirement Violates the Supremacy Clause

The first challenged provision, the Tip-Off Requirement, is preempted and impermissibly discriminates against the federal government. Whenever federal immigration officials "request" any "records or information" maintained by New York's Department of Motor Vehicles (DMV), the DMV Commissioner must "notify" the relevant individual about that request and identify the requesting entity. N.Y. Veh. & Traf. Law § 201(12)(a). New York lacks authority to interfere with federal law enforcement in this way.

#### A. The Tip-Off Requirement Is Preempted

The Tip-Off Requirement is extraordinary. It directs a state official to take affirmative action—tipping off an alien who is subject to a federal request for information—in a way that is virtually guaranteed to inhibit federal officers' ability to enforce the law. *See* N.Y. Veh. & Traf. Law § 201(12)(a). It is hard to imagine a provision that more obviously "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation marks omitted). As previously explained, the Tip-Off Requirement is analogous to a general requirement to inform an individual that he is

the subject of an ongoing FBI investigation. *See* Opening Br. 16-17. It cannot be seriously argued that such a requirement would be permissible, and the Tip-Off Requirement is no more permissible in the immigration context.

Defendants fail to distinguish or even engage with this simple analogy, and the implication of that omission is clear. Defendants offer an understanding of preemption that would not only allow the Tip-Off Requirement but would also permit States to tip off a suspected criminal who is the subject of an FBI investigation. The Supremacy Clause is not so toothless.

**1.** The Tip-Off Requirement self-evidently interferes with immigration officials' ability to enforce the law. *See* Opening Br. 16-20. Informing an individual about an ongoing investigation—including by sharing the specific entity conducting that investigation—at least provides an incentive for that individual to flee or otherwise evade detection. *See* Opening Br. 17-18. Doing so within three days of any request, as the Tip-Off Requirement necessitates, only heightens that risk. Indeed, the Tip-Off Requirement makes it nearly impossible for federal officials to seek help from state actors for fear that doing so will ruin an ongoing investigation. Opening Br. 18-20. After spending months or years investigating a suspect, that work may be erased when an immigration official reaches out to state authorities for assistance, thereby triggering a tip-off obligation that may allow the individual to abscond or to take other action that might threaten federal officers' safety. Regardless of the degree to which state officials must provide assistance when asked, they cannot actively stand in the way.

Defendants fault the federal government for failing to identify a specific, conflicting provision of federal law. Appellees' Br. 34-39. A State cannot escape preemption by enacting a provision that interferes with federal law in a fundamental and broad-based manner rather than conflicting with an isolated provision. But in any event, to the extent that citations to the United States Code are necessary to establish the basic point that Congress expected federal officials to be able to investigate and detain individuals who may be subject to deportation, numerous provisions fit the bill. *See, e.g.*, 8 U.S.C. § 1226(c)(1) (mandatory detention of certain "criminal aliens"); *id.* § 1226(d) (mandatory creation of system of identifying criminal aliens); *id.* § 1226a (mandatory detention of suspected terrorists); *id.* § 1227(a)(1)(E) (allowing for deportation of aliens who engage in smuggling, even after that alien was lawfully admitted). When a state official tips off a suspected alien, he interferes with the federal government's ability to enforce whatever law motivated the investigation. The fact that potential statutes in that category are too numerous to list only underscores the exceptional nature of New York's Tip-Off Requirement and is not a basis for affirming the district court's decision.

Indeed, defendants' own cited authority undermines their position. *See* Appellees' Br. 34. In *MTBE*, this Court explained that "[w]hat constitutes a sufficient obstacle" for preemption requires consideration of "the federal statute as a whole and identifying its purpose and intended effects." *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013) (quotation marks omitted) (*MTBE*); *see Arizona*,

567 U.S. at 400 (similar). And the Supreme Court has recently clarified that state laws are "often" held to be "impliedly preempted" even when there is no specific statute that was the source of the conflict. *Kansas v. Garcia*, 589 U.S. 191, 203 (2020). Restrictions or rights can be "inferred from statutory law." *Id.* It is far from difficult to infer a conflict here. Congress enacted a detailed scheme for investigation, detention, and removal, and state law interferes with that scheme by requiring state officials to tip off the target of an investigation. In this context, it is hardly surprising that Congress did not provide a right to such notice, despite allowing for notice in other circumstances. *See* Opening Br. 18-19 (collecting statutes).

In fact, the preemption argument at issue in *Kansas* provides a useful contrast. There, the Supreme Court held that enforcement of a state criminal law did not "frustrate[] any federal interests" merely because the state criminal laws "overlap to some degree with federal criminal provisions." *Kansas*, 589 U.S. at 211-12. Here, New York is not enforcing parallel state laws but actively undermining the federal government's authority to enforce its own laws. By challenging the Tip-Off Requirement, the federal government is invoking far more than "some brooding federal interest" in support of its preemption claim. *But see* Appellees' Br. 35 (quoting *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion)). That Requirement conflicts with an assumption that underlies the entire federal enforcement scheme.

**2.** Defendants give away the game when they attempt to justify the Tip-Off Requirement as providing individuals with an opportunity to "raise any appropriate

legal or factual objection to the requested disclosure," Appellees' Br. 35, so that those individuals can avoid "potentially severe and irreparable consequences such as detention and removal," Appellees' Br. 40. New York has no basis for protecting aliens from what it regards as unwarranted "detention and removal" by the federal government. To the contrary, it is the federal government's sole prerogative to make determinations about immigration detention and removal. *See Arizona*, 567 U.S. at 409 ("[T]he removal process is entrusted to the discretion of the Federal Government."). Once again, an analogy to criminal enforcement illustrates the point: disclosure of information to the FBI could lead to incarceration and criminal conviction but that does not mean a State that prefers to avoid those consequences can tip off suspected criminals of FBI investigations.

In district court, defendants sought to justify the Tip-Off Requirement with an atextual limitation on its scope, urging that the Tip-Off Requirement is "triggered only upon a request . . . that is accompanied by a lawful court order or judicial warrant, not by invalid requests that do not satisfy the standards for disclosure." *See* Dkt. No. 30, at 8-9. It is unclear how that understanding would be reconciled with their newly minted defense of the provision on appeal, which in the context of a court order or judicial warrant would seem to second-guess not only the Executive Branch but the courts. But in any event, they have now abandoned that theory, instead recognizing that the Tip-Off Requirement, as its text suggests, applies in a broader set of circumstances: whenever state officials "receiv[e] a request for information or records" from federal

immigration authorities. Appellees' Br. 10; *see also* Appellees' Br. 35 (recognizing provision applies whenever information "may be disclosed," even if it is not actually disclosed). But that (proper) understanding of the statute also cannot be reconciled with New York's rationale, as state officials may tip off individuals even where there is no need to entertain any legal or factual objection to the disclosure—*e.g.*, when New York would refuse the Department of Homeland Security's (DHS) request because state law forecloses that disclosure.

Worse still, defendants' shifting-sands position belies any claim that the Tip-Off Requirement implements a legitimate state policy goal. *But see* Appellees' Br. 22. Now, according to defendants, suspected aliens can raise *any* objection to *any* request for information by federal immigration authorities—even one that would not otherwise result in the disclosure of information. As discussed above, defendants are forced to justify that provision based on concerns about immigration enforcement itself, with no connection to privacy interests, state licensing, driver safety, or any possible area of permissible state regulation. *See* Appellees' Br. 40 (discussing "potentially severe and irreparable consequences[,] such as detention and removal from the United States").

This is entirely consistent with the legislative history defendants cite, to the extent that history is relevant. *See* Appellees' Br. 11-12, 36. As one legislator put it, the Tip-Off Requirement was added "because [the bill sponsor] ha[d] an interest in protecting individuals" who are "undocumented . . . from deportation." N.Y. Assembly Debate on Bill A3675B, at 140 (June 12, 2019), https://perma.cc/2C4Z-SNX8 (Nicole

Malliotakis). Indeed, a sponsor expressly said that Requirement was in part "an issue of due process," believing that individuals "have a right to know if an agency has requested information about them." N.Y. Senate Debate on Bill A3675B, *supra*, at 5968 (Luis R. Sepúlveda). About the bill more generally, the same sponsor added that its "objective" was "to protect people from immigration enforcement." *Id.* at 5958. And the Tip-Off Requirement supports that stated goal, providing notice that might allow individuals to evade detection and detention or to take other action that might put officers in harm's way.

Against this backdrop, defendants' reliance on a presumption against preemption is misplaced. The Tip-Off Requirement is designed to thwart immigration enforcement, not serve any legitimate state interest, providing individuals with the right to object to immigration investigations. In such circumstances, the presumption against preemption "does not apply" because the state law "interfere[s] with inherently federal relationships" and "control[s] federal operations." *GEO Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (en banc). Additionally, the Tip-Off Requirement purports to regulate matters that are "inherently federal in character," *i.e.*, immigration, such that no presumption applies. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).

**3.** Finally, defendants gesture at the Tenth Amendment's anti-commandeering principles but do not make a full-throated argument that those principles justify the Tip-Off Requirement. Appellees' Br. 42-44 (focusing on argument about "compell[ing] the State to share its information and records"). Nor could they.

The Tenth Amendment establishes an anti-commandeering doctrine that prevents Congress from "directly compelling" states "to enact and enforce a federal regulatory program." *New York v. United States*, 505 U.S. 144, 161 (1992) (quotation marks omitted); *see Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 474-75 (2018) (invalidating a federal statute that made it unlawful for state governmental entity to authorize sports gambling). It also prohibits Congress from "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 933-35 (1997) (invalidating federal statute that required state officials to conduct background checks for firearms purchasers).

Invalidating the Tip-Off Requirement would not require New York to regulate in a particular area by enacting or repealing a particular law, as in *New York* and *Murphy*, or require New York to enforce a federal regulatory scheme, as in *Printz*. Instead, it would only prevent state actors from taking affirmative actions that frustrate the enforcement of federal immigration law. The Tenth Amendment does not give the States the right to "frustrate[] federal programs" in this way. *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (rejecting Tenth Amendment challenge to Section 1373's bar on state policies prohibiting information sharing with federal immigration authorities); *see also New York v. Department of Just.*, 951 F.3d 84, 112-14 (2d Cir. 2020).

### B. The Tip-Off Requirement Improperly Discriminates Against the Federal Government

The Tip-Off Requirement is independently invalid under principles of intergovernmental immunity. As previously explained, that Requirement singles out federal immigration officials for less favorable treatment, discriminating against the federal government in violation of well-established law. Opening Br. 22-24; *see also United States v. Washington*, 596 U.S. 832, 838 (2022). The Requirement only applies to requests from federal immigration authorities, excluding any request from any other law-enforcement officer.

**1.** Like the district court, defendants claim "there is no discrimination problem" because state law does "not treat anyone else better than the federal government." Appellees' Br. 48. But it is difficult to square this argument with defendants' admission that the Tip-Off Requirement targets a "distinctly federal function" and applies to "requests only from agencies that primarily enforce immigration law." Appellees' Br. 47. In light of these facts, as previously explained, it is easy to identify a comparator. Opening Br. 23-24. State and local law enforcement officers fit the bill. When those officers request DMV information, the Tip-Off Requirement is not triggered.

Defendants attempt to side-step that conclusion, arguing local officials are not "similarly situated" because they "do not engage in immigration enforcement." Appellees' Br. 48-49. But identifying activities in which only the federal government engages is not a legitimate basis on which to discriminate against the federal

government. A state or locality could not, for example, impose a tax only on DHS workers or soldiers in the armed forces. Accordingly, in *United States v. King County*, 122 F.4th 740 (9th Cir. 2024), the Ninth Circuit invalidated a local law prohibiting an airport from servicing businesses engaged in immigration deportation. *Id.* at 748, 757-58. The court explained that "the only entity" engaged in "deporting immigration detainees[] is the federal government." *Id.* at 757. Because the local law "burden[ed] federal operations, and *only* federal operations," it unlawfully discriminated against the federal government. *Id.* (quotation marks omitted); *see also United States v. California*, 921 F.3d 865, 882 (9th Cir. 2019) (concluding that state law requiring inspections of immigration detention facilities was discriminatory because it "relate[d] exclusively to federal conduct"). The same is true here; the Tip-Off Requirement only burdens federal officers' ability to enforce federal immigration law.

Defendants also strip from context the Seventh Circuit's conclusion in *McHenry* that a valid discrimination claim does not arise from state enactments that simply "touch[] on an exclusively federal sphere." *McHenry County v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022). In *McHenry*, the court recognized that if a State declined to engage in a particular activity—there, housing immigration detainees—a valid discrimination claim could not lie merely because only the federal government engaged in that activity. A contrary conclusion would compel States to participate in a federal program.

Here, defendants are not being asked to engage in immigration enforcement; instead, they are being asked to treat the federal officials who enforce federal

immigration law the same as other law enforcement officers who ask for similar cooperation under similar circumstances. This case is thus more like *Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), where the Ninth Circuit held that a state enactment that "single[d] out" a nuclear site owned by the federal government discriminated against the federal government, *id.* at 842 (quotation marks omitted). The federal government engages in a lot of unique activities, and it would be extraordinary to suggest that States can lawfully effectuate discrimination against the federal government and skirt around the Supremacy Clause simply by naming those activities rather than identifying the federal government specifically.

**2.** Defendants otherwise argue the federal government failed to preserve an intergovernmental immunity challenge for the Tip-Off Requirement. Appellees' Br. 46. The district court did not make a forfeiture finding, instead only stating the government was "constructively amend[ing]" its complaint. *See* JA48 n.11 (cross-referencing JA35 n.4 (quotation marks omitted)). If the district court truly concluded the argument to be outside the pleadings, it should have considered whether the government could amend its complaint—as it was required to "freely give leave" to amend "when justice so requires." *See* Fed. R. Civ. P. 15(a)(2); *cf. Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ("Outright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion."). Instead, the district court addressed the question on the merits, *see* JA48 n.11, after defendants briefed the issues without objection. *See* Dkt. No. 30, at 9-10. Thus, the issue is ripe for this court to review. *See United States v. Young*,

998 F.3d 43, 52 n.2 (2d Cir. 2021) ("[W]e do not consider arguments waived when, although not raised below, they were nevertheless passed on by the district court." (quotation marks omitted)).[1]

In any event, the district court was incorrect in its understanding of the complaint. The complaint expressly alleged that the "Green Light Law 'singles out' federal immigration authorities . . . for disfavored treatment." JA22. That statement is broad enough to include the Tip-Off Requirement, even if the complaint went on to address other examples. *See* JA22. And defendants do not seem to argue otherwise. Appellees' Br. 46 (arguing only that the federal government "did not *clearly* allege" as much "in its complaint" (emphasis added)).

## II. The Green Light Law's Information-Sharing Restriction Violates the Supremacy Clause

In the next challenged provision, the Information-Sharing Restriction, New York prevented its officers from sharing virtually any DMV information related to standard driver's licenses with federal immigration authorities—at least absent a judicial warrant. *See* N.Y. Veh. & Traf. Law §§ 201(8)-(12), 508(3). This Restriction is precisely the sort of state law that Congress expressly preempted in 8 U.S.C. §§ 1373(a), 1644.

---

[1] For similar reasons, if the Court accepts this argument, a remand would be the proper recourse. Because defendants never objected, the government was never required to seek or justify amendment—which would be warranted on this record. There is no "good reason" to deny amendment here. *Jin*, 310 F.3d at 101.

In addition, the Information-Sharing Restriction improperly discriminates against the federal government.

### A. The Information-Sharing Restriction Is Preempted

The Information-Sharing Restriction is expressly preempted, and that alone requires reversal.

**1.** As our opening brief explained, the district court ignored a fundamental flaw in the Information-Sharing Restriction. Opening Br. 26-27. It saw no conflict "apparent from the face of the [federal and state] statutes," noting that the Green Light Law prevents state actors from "inquiring about the immigration status of standard license applicants." JA37 (quotation marks omitted). But the district court never addressed whether state officials may nonetheless share status information they do possess. State law prevents them from doing so, creating a facial conflict between the Information-Sharing Restriction and 8 U.S.C. § 1373(a)—which prohibits restrictions of this sort.

Defendants offer no meaningful response to this point, chiefly doubling down on the district court's error. Appellees' Br. 25-26. It may be true that state officials cannot inquire about immigration status, N.Y. Veh. & Traf. Law § 502(8)(e)(ii), and state officials can retain records only for a "limited period," *id.* § 502(d). But neither point conclusively establishes that state officials will never receive or possess "citizenship or immigration status" information. *See* 8 U.S.C. § 1373. When they do,

they must be free to share that information with federal authorities, *id.*, yet state law prevents them from doing so.

Defendants offer no valid basis for distinguishing *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025), which is instructive on this point. Although the state law at issue in *Illinois* expressly barred state actors from sharing "citizenship or immigration" information, *id.* at 519 (quotation marks omitted), the Information-Sharing Restriction here is no more permissible just because it is less explicit. Appellees' Br. 27 n.15. The Restriction prohibits the same information sharing, and defendants do not argue otherwise. As a result, the Information-Sharing Restriction conflicts with federal law.

This conflict does not "rest on speculation," as defendants mistakenly contend. Appellees' Br. 26. State law prevents officials from sharing information with the federal government and that runs headlong into Congress's express preemption provision. That is a real, concrete conflict. Indeed, the fact that state officials *hypothetically* might not receive citizenship or immigration status information cannot be the basis for avoiding preemption. If that were true, then New York could pass any licensing law it wished, claim there exists some remote possibility that no one would apply for such a license, and defeat a preemption claim. That cannot be the case.

Defendants' cited cases do not support a contrary rule. In *California Coastal*, the Supreme Court considered a "state statute" that did not "detail exactly what state standards" would apply to "various federal activities." *California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 586 (1987). Instead, California's Coastal Commission

had authority to place "particular conditions on the issuance of a permit," and the record did not "disclose what conditions" it would impose. *Id.* at 579-80. In short, *California Coastal* addressed a circumstance when the scope of state law had not yet become clear, and in that posture, any "possible set of" state-law "conditions not pre-empted by federal law" could rebuff a facial challenge. *Id.* at 579-80, 589. Defendants' cited portion of *Arizona* similarly refers to open questions about the construction of state law. *See Arizona*, 567 U.S. at 415 (refusing to "assume" state law would "be construed" to conflict with federal law). Here, the bounds of state law are not in dispute: state officials cannot share any standard-license DMV information with federal immigration authorities, and that bar covers status information. N.Y. Veh. & Traf. Law §§ 201(8)-(12), 508(3). And defendants do not identify any application of the state law that would be consonant with federal law. As a result, there is an actual conflict, and under the Supremacy Clause state law must yield.

**2.** Although the facial conflict above is sufficient to require reversal, the problem runs deeper. *See* Opening Br. 27-29. Congress prohibited restrictions on the ability to share any "information *regarding* . . . citizenship or immigration status." 8 U.S.C. § 1373(a) (emphasis added). For the word "regarding" to have any meaning, this statute must extend beyond an individual's legal classification to reach at least facts that bear on his status. Defendants admit that under this interpretation Section 1373 would "sweep in information protected by the Green Light Law," creating an express conflict between state and federal law. *See* Appellees' Br. 28.

Again, defendants offer no real response to this conclusion. *See* Appellees' Br. 28-29. Instead, they repeat the district court's fundamental mistake—reading the word "regarding" out of the statute. Indeed, defendants fail to even acknowledge the Supreme Court's instruction that the word "regarding" generally has a broadening effect. *See Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). By doing so, defendants violate two of the most basic rules of statutory interpretation: courts "must enforce plain and unambiguous statutory language," *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 184 (2020) (quotation marks omitted), and "every clause and word of a statute should have meaning," *United States ex rel. Polansky v. Executive Health Res., Inc.*, 599 U.S. 419, 432 (2023) (quotation marks omitted).

Worse still, defendants ignore the fact that "differences in language" are presumed to "convey differences in meaning." *Rudisill v. McDonough*, 601 U.S. 294, 308 (2024) (quotation marks omitted). They admit that Section 1373(a)'s use of "regarding . . . citizenship or immigration status" contrasts with Congress's choice to use the phrase "citizenship or immigration status" in Section 1373(c) without the "regarding" modifier. Appellees' Br. 29. Yet defendants assert—without explanation—these provisions "are most naturally read as mirror images of each other." *Id.* They contend that "[t]here is no reason to believe one subpart was intended to have a broader scope than the other," Appellees' Br. 30, but the plain statutory text provides that reason.

Defendants' brief reference to other statutory provisions does not support their interpretation. *See* Appellees' Br. 30 (citing, *e.g.*, 8 U.S.C. § 1360(a)). Congress may have

used different phrases to refer to different classes of information in other statutory provisions. But that does not change the fact that the word "regarding" must be given some effect, specifically a broadening effect, in the statutory language.

**3.** This Court's precedent forecloses defendants' related arguments that Section 1373(a) lacks preemptive effect and that invalidating the Information-Sharing Restriction would commandeer state action. *See* Appellees' Br. 32-33, 42-44.

In *City of New York*, 179 F.3d 29, the Court rejected a claim that Section 1373(a) violates the anti-commandeering doctrine, explaining that the federal statute does not "compel[] state and local governments to enact or administer any federal regulatory program" or "conscript[] states, localities, or their employees into the federal government's service." *Id.* at 35. The Court emphasized that a contrary result would "turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing States and localities to engage in passive resistance that frustrates federal programs." *Id.* And after the Supreme Court's decision in *Murphy*, addressing the preemptive effect of statutes, this Court declined to hold that *City of New York*'s holding "does not survive" *Murphy*, concluding that it "does not follow" from *Murphy* that "§ 1373, on its face, violates the Tenth Amendment." *New York*, 951 F.3d at 112-13.

New York's efforts to avoid this precedent are unavailing. The Information-Sharing Restriction does not qualify as a "generalized confidentiality polic[y] that [is] necessary to the performance of legitimate municipal functions." *City of New York*, 179

F.3d at 37. Instead, the Restriction is a targeted provision that places unique burdens "only [on] federal immigration officials"—just like the policies in *City of New York*. Defendants recognize as much. Appellees' Br. 9 (recognizing the law imposes "protections specifically to address" information sharing with immigration authorities). Thus, this Court's decision in *City of New York* is precisely on point.

Similarly, the fact that this Court did not "conclusively decide the preemptive effect of § 1373" in *New York* does not render the question up for debate. *New York*, 951 F.3d at 114 n.27. The Court said in no uncertain terms that "§ 1373 is one provision of a larger statute, the [Immigration and Nationality Act], which certainly confers rights and places restrictions on large numbers of private persons." *Id.* Under *Murphy*, that is enough for Section 1373(a) to have preemptive effect. *See* 584 U.S. at 472. And this Court's choice not to delimit the precise bounds of that effect in *New York* does not alter that conclusion. Nor can defendants rely on an out-of-circuit decision holding that Section 1373 "cannot be fairly read" as regulating private actors when this Court has already held that it does exactly that. *See* Appellees' Br. 33 (quoting *Ocean Cnty. Bd. of Comm'rs v. Attorney Gen.*, 8 F.4th 176, 182 (3d Cir. 2021)).

Even setting this precedent aside, information-sharing requirements cannot constitute commandeering. In *Printz*, the Supreme Court drew a distinction between federal laws involving "forced participation . . . in the actual administration of a federal program" and those "requir[ing] only the provision of information to the Federal

Government." 521 U.S. at 918. Laws that only require information sharing do not create commandeering concerns or implicate the Tenth Amendment.

**4.** As above, defendants cannot rely on a presumption against preemption. *See supra* p. 8. The presumption does not apply for claims of express preemption, *DCC Propane, LLC v. KMT Enters., Inc.*, 147 F.4th 171, 174 (2d Cir. 2025), nor does it apply when state law purports to control inherently federal relationships like the Information-Sharing Restriction does here, *see GEO Grp.*, 50 F.4th at 761.

### B. The Information-Sharing Restriction Improperly Discriminates Against the Federal Government

For essentially the same reasons discussed above with regard to the Tip-Off Requirement, *see supra* pp. 10-13, the Information-Sharing Restriction unlawfully discriminates against the federal government because it "singles [the federal government] out for less favorable treatment." *Washington*, 596 U.S. at 839 (alteration and quotation marks omitted). Defendants' suggestion that the United States needed to find a specific comparator echoes its reasoning with regard to the Tip-Off Requirement and is mistaken for the same reasons.

## III. The Green Light Law's Certification Requirement Violates the Supremacy Clause

The final aspect of the Green Light Law challenged here, the Certification Requirement, forces federal officials to change how they perform their federal functions. Any federal officer who receives DMV information must certify that he will not use the information for civil immigration purposes or share the information with

federal immigration authorities. N.Y. Veh. & Traf. Law § 201(12)(b). Officials who receive this information must also record "all uses" of that information and any time that information was shared with federal immigration authorities. *Id.* Violation of these requirements is a class E felony, punishable by up to four years in prison. *Id.* § 201(12)(b)-(c); *see also* N.Y. Penal Law § 70.00(2)-(3).

This Certification Requirement is flawed three times over. It directly regulates federal officials, improperly discriminates against the federal government, and is preempted. Again, New York enacted the Certification Requirement with the purpose and effect of interfering with federal officers' ability to enforce federal immigration law.

### A. The Certification Requirement Directly Regulates the Federal Government

The Certification Requirement controls how federal officers perform their federal functions. *See* Opening Br. 33-34. By doing so, that Requirement "places . . . prohibition[s] on the Federal Government." *Hancock v. Train*, 426 U.S. 167, 180 (1976) (quotation marks omitted). Defendants do not meaningfully argue otherwise, only attempting to minimize or justify those prohibitions. *See* Appellees' Br. 51 (admitting these provisions "regulate[] the use of DMV's information by . . . the federal government"). But States lack authority to directly regulate the federal government in any capacity, and as a result, the Certification Requirement violates the Supremacy Clause. *See id.*

To the extent defendants suggest the Green Light Law is permissible because it directs a state actor, the DMV Commissioner, to regulate federal officials instead of doing so itself, that argument cannot prevail. *See* Appellees' Br. 51. The DMV Commissioner is a named defendant, and he may be enjoined. Moreover, a statute that directs a state official to regulate the federal government is no more permissible than one that skips that procedural step. The possibility that a federal official could be thrown in a New York State prison belies any claim that the federal government is not being regulated, and the precise mechanism for regulation is irrelevant. States cannot escape the Supremacy Clause by directing their agents to compel federal officials to submit to requirements that the State could not impose directly. *See Johnson v. Maryland*, 254 U.S. 51 (1920) (invalidating state law that required federal employees to obtain a state driver's license).

Defendants' suggestion that the Certification Requirement "regulates the use of *state* information" is a non-sequitur. Appellees' Br. 50-54. New York's DMV information is certainly information collected under a state program, but that does not respond to the constitutional problem here. The Certification Requirement restricts how federal officials use that information when it lawfully comes into their possession. It is the restrictions on federal officials, backed by criminal penalties, that violate the Supremacy Clause. The nature of the information is irrelevant. After all, States may have "sovereign interests" in shielding some information from disclosure, but those interests cannot justify regulation of the federal government. *See* Appellees' Br. 50.

Similarly, defendants' characterization of the Certification Requirement as imposing only an "incidental . . . burden" is irrelevant. Appellees' Br. 52-53. When state law purports to control federal officers in the performance of federal duties, the "degree" to which state law "interfere[s] with the activities of the United States" does not matter. *United States v. California*, 173 F.4th 1060, 1068 (9th Cir. 2026). This point applies as much to direct regulation of federal officers' ability to enforce federal law as it does to the qualifications of those officers, *see id.*, or the regulation of federal property, *see Hancock*, 426 U.S. at 180. As a result, defendants' attempt to distinguish precedent based on the specific burdens at issue in those cases and the significance of those burdens falls flat. *See* Appellees' Br. 53-54.

Nor can defendants rely on decisions that address government contractors, given that the Certification Requirement applies directly to federal officers. *See* Appellees' Br. 53 (first citing, *e.g.*, *GEO Grp., Inc. v. Inslee*, 151 F.4th 1107, 1116-18 (9th Cir. 2025); then citing *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 771 (9th Cir. 2025); and then citing *McHenry County*, 44 F.4th at 592-93). As those decisions stressed, States have "greater ability to regulate a contractor of the federal government than to regulate the government itself." *GEO Grp.*, 151 F.4th at 1116; *see also McHenry County*, 44 F.4th at 593 & n.6 (similar).

Even if this point were relevant, defendants mischaracterize the Certification Requirement as imposing only incidental costs on the federal government. *See* Appellees' Br. 52-53. Federal officials are not "free to carry out their immigration

enforcement activities in the State as they see fit" because the Certification Requirement prohibits those officials from using information lawfully in their possession to do exactly that. *Contra id.* That is far from the incidental burden of a generally applicable statute—like the rules of the road—even assuming States can enforce such provisions without federal assent.

The Seventh Circuit's decision in *McHenry County* only underscores the error in defendants' argument. 44 F.4th at 593. That case addressed an Illinois law that restricted state and local officials from entering "a cooperative agreement for immigration detention." *Id.* The "intended consequence" of that act was preventing cooperation with federal authorities, but that did not mean the act operated as a direct regulation of federal officers themselves. *Id.* The Illinois provision only controlled state officers' conduct and was not backed by criminal penalties. The Certification Requirement is entirely different. It imposes direct burdens on federal officers—restricting how those officers perform their federal functions. Those burdens are impermissible under the Supremacy Clause.

### B. The Certification Requirement Improperly Discriminates Against the Federal Government

For essentially the same reasons discussed above, *see supra* pp. 10-13, the Certification Requirement unlawfully discriminates against the federal government. As the government explained, the Certification Requirement applies only to the federal government or those that deal with the federal government. Opening Br. 36-37.

Defendants' suggestion that the United States needed to find a specific comparator echoes its reasoning with regard to the other challenged provisions and is mistaken for the same reasons. Likewise, the federal government preserved this argument in the district court, as explained above. *See supra* pp. 12-13.

### C. The Certification Requirement Is Preempted

Finally, Section 1373(a) in Title 8 expressly preempts aspects of the Certification Requirement. That statutory subsection preempts any state statute that "in any way restrict[s]" an officer's ability to send certain information to federal immigration authorities. 8 U.S.C. § 1373(a). And the Certification Requirement imposes such a restriction—prohibiting any authorized recipient of DMV information from sharing that information with federal immigration authorities. As explained, defendants' arguments against express preemption are unpersuasive. *See supra* pp. 14-20.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*s/ J. Kain Day*
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*
*j.kain.day@usdoj.gov*

August 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,050 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ J. Kain Day*
J. Kain Day