# No. 26-387

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STATE OF NEW YORK, KATHLEEN HOCHUL, *Governor of New York, in her Official Capacity*, LETITIA JAMES, *Attorney General of New York, in her Official Capacity*, MARK J.F. SCHROEDER, *Commissioner of the New York State Department of Motor Vehicles, in his Official Capacity*,

*Defendants-Appellees*.

On appeal from the United States District Court
for the Northern District of New York

**CORRECTED BRIEF OF *AMICI CURIAE* FEDERALISM PROFESSORS JESSICA BULMAN-POZEN, BRIDGET FAHEY, AZIZ HUQ, GILLIAN METZGER, MIRIAM SEIFTER, CAROLYN SHAPIRO, AND ROBERT YABLON IN SUPPORT OF DEFENDANT-APPELLEE AND AFFIRMANCE**

David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Amici Curiae*

August 26, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

STATEMENT OF INTEREST .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 5

I. INTERGOVERNMENTAL IMMUNITY APPLIES ONLY WHERE STATES PALPABLY SUBVERT FEDERAL SOVEREIGNTY .......... 5

II. STATES DO NOT DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT WHEN THEY DECLINE TO ASSIST FEDERAL OPERATIONS .......... 15

III. STATES DO NOT DIRECTLY REGULATE THE FEDERAL GOVERNMENT BY SETTING CONDITIONS ON THE USE OF STATE ASSETS .......... 23

CONCLUSION .......... 27

CERTIFICATE OF COMPLIANCE .......... 28

CERTIFICATE OF SERVICE .......... 29

# TABLE OF AUTHORITIES

## CASES

*Alden v. Maine*, 527 U.S. 706 (1999) ....................7

*Bond v. United States*, 564 U.S. 211 (2011) ....................6

*Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548 (1937) .................... 8, 20, 25

*Collins v. Yosemite Park & Curry Co*., 304 U.S. 518 (1938) ....................8

*CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315 (3d Cir. 2025) ....................14

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989) ....................16

*Dawson v. Steager*, 586 U.S. 171 (2019) .................... 11, 16

*Fed. Mar. Comm'n v. S.C. State Ports Auth*., 535 U.S. 743 (2002) ....................8

*Graves v. New York ex rel. O'Keefe*, 306 U.S. 466 (1939) ....................11

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ....................6, 7

*Helvering v. Gerhardt*, 304 U.S. 405 (1938) ....................18

*Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999) .................... 12, 13, 24

*Johnson v. Maryland*, 254 U.S. 51 (1920) .................... 12, 13, 24

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) .................... 14, 24

*McCulloch v. Maryland*, 17 U.S. 316 (1819) .................... 9, 10

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) .................... 17, 23

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co*.,
514 U.S. 645 (1995) ....................6

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) .................... 8, 20, 21, 26

*New York v. United States*, 505 U.S. 144 (1992) .................... passim

*North Dakota v. United States*, 495 U.S. 423 (1990) .................... 5, 14, 17

*Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261 (1943) .............13

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)..................... 20, 26

*Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376 (1960) ....................16

*Printz v. United States*, 521 U.S. 898 (1997).......................................... 7, 8, 21, 22

*South Dakota v. Dole*, 483 U.S. 203 (1987) .........................................................20

*Sugarman v. Dougall*, 413 U.S. 634 (1973) .........................................................19

*Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186 (5th Cir. 2024)....................18

*United States v. Bekins*, 304 U.S. 27 (1938)..................................................... 25, 26

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) .............................. 17, 23

*United States v. City of Detroit*, 355 U.S. 466 (1958) ...........................................12

*United States v. City of Philadelphia*, 798 F.2d 81 (3d Cir. 1986)..........................15

*United States v. Washington*, 596 U.S. 832 (2022) ........................................... 5, 10

*Va. Uranium, Inc. v. Warren*, 587 U.S. 761 (2019)..................................................7

*W. Union Tel. Co. v. Kansas ex rel. Coleman*, 216 U.S. 1 (1910) ..........................24

*Washington v. United States*, 460 U.S. 536 (1983) ......................................... 11, 16

**STATUTES AND REGULATIONS**

8 U.S.C. § 1103 ......................................................................................................21

33 U.S.C. § 1342 ....................................................................................................21

42 U.S.C. § 1396a ..................................................................................................21

N.Y. Veh. & Traf. Laws § 201 ...............................................................................16

**OTHER AUTHORITIES**

Bridget A. Fahey, *Consent Procedures and American Federalism*, 128 Harv. L. Rev. 1561 (2015).......................................................................22

Bridget A. Fahey, *Federalism by Contract*, 129 Yale L.J. 2326 (2020) ....................9

Bridget A. Fahey, *The New Commandeering*, 2025 Sup. Ct. Rev. 167 ........... 19, 21

The Federalist No. 46 (James Madison) (Clinton Rossiter ed., 1961) .....................20

The Federalist No. 51 (James Madison) (Clinton Rossiter ed., 1961) ..................6, 9

Aziz Z. Huq, *The Negotiated Structural Constitution*,
114 Colum. L. Rev. 1595 (2014)........................................................................9

Gillian E. Metzger, *Disqualification, Immunity, and the Presidency*,
138 Harv. L. Rev. F. 112 (2025)......................................................................10

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000)............................................15

Erin Ryan, *Negotiating Federalism*, 52 B.C. L. Rev. 1 (2011).................................9

Laurence H. Tribe, *American Constitutional Law* (1978).......................................15

## STATEMENT OF INTEREST[1]

*Amici Curiae* are seven law professors with recognized expertise on matters of federalism, state public law, and federal constitutional structure. They have written and published extensively in these areas and have a professional interest in promoting a proper understanding of the federalism principles at issue in this case. Their names are listed below, with institutional affiliations provided for identification purposes only:

- **Jessica Bulman-Pozen**, Betts Professor of Law and Faculty Co-Director, Center for Constitutional Governance, Columbia Law School
- **Bridget Fahey**, Professor of Law, University of Chicago Law School
- **Aziz Huq**, Frank and Bernice J. Greenberg Professor of Law, University of Chicago Law School
- **Gillian Metzger**, Harlan Fiske Stone Professor of Constitutional Law and Faculty Co-Director, Center for Constitutional Governance, Columbia Law School
- **Miriam Seifter**, Richard E. Johnson Bascom Professor of Law and Faculty Co-Director, State Democracy Research Initiative, University of Wisconsin Law School

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that (i) neither party's counsel authored this brief in whole or in part; (ii) neither party, nor their counsel, contributed money that was intended to fund preparing or submitting the brief; and (iii) no person other than *amici* or their counsel contributed money that was intended to fund preparing or submitting the brief.

- **Carolyn Shapiro**, Professor of Law and Co-Director, Institute on the Supreme Court of the United States, Chicago-Kent College of Law
- **Robert Yablon**, Professor of Law & Faculty Co-Director, State Democracy Research Initiative, University of Wisconsin Law School

*Amici Curiae* file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, and all parties to the appeal have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The federal government is increasingly invoking the doctrine of "intergovernmental immunity" to challenge state policies it finds irksome, including policies that aim to protect state property, capacity, or—as here—sensitive information about residents. In its standard formulation, intergovernmental immunity doctrine holds that states violate the U.S. Constitution's Supremacy Clause when they "discriminate against" or "directly regulate" the federal government. In this appeal, the federal government claims that three provisions of New York's Driver's License Access and Privacy Act which seek to limit disclosure of sensitive state data for immigration purposes violate the doctrine.

Properly understood, intergovernmental immunity is a narrower doctrine than the federal government suggests. It coexists with—and is constrained by—other federalism doctrines and principles that collectively sustain the Constitution's system of dual sovereignty. Some of these doctrines, including intergovernmental

immunity and preemption, serve to protect federal prerogatives, while remaining mindful of state interests; others, such as anti-commandeering and anti-coercion principles, protect states, while remaining mindful of federal interests. Together, these doctrines allow for a degree of state-federal friction, contestation, and negotiation. They reflect the deeply rooted precept that, in a compound republic, competing sovereigns can and should check one another.

At bottom, intergovernmental immunity doctrine simply holds that, in the dynamic push and pull between federal and state power, states cannot go so far as to invert the Supremacy Clause and seek to control and subordinate the federal government. The canonical intergovernmental immunity cases are therefore ones in which states have tried to impose taxes or fees on the federal government directly, or to force federal instrumentalities or personnel to obtain state permits or licenses before performing their congressionally authorized duties. But these cases make clear that states do not violate the Constitution simply because their laws or actions constrain the federal government's ability to do as it wishes.

Intergovernmental immunity is especially inapt where, as here, the challenged state policies govern state control over state resources. New York is not seeking to dictate or control how the federal government uses its own information. Instead, the three provisions challenged here all concern how the state chooses to handle state-collected data on its own residents. One addresses whether and how state officials

inform state residents when a federal officer seeks their state-held information. Another limits when state officials may themselves disclose that data. And the third sets conditions on how that data may be used when the state does share it. Simply put, none of these laws implicates intergovernmental immunity. That is because the doctrine shields the federal government from state arrogation; it does not compel states to relinquish control of their own assets and effectively subsidize federal efforts to implement federal policy preferences.

If federal actors believe that states are unduly impeding lawful federal conduct, the proper recourse is usually preemption, not intergovernmental immunity. The Supremacy Clause, after all, empowers Congress to displace state laws. The option of legislative preemption helps explain why courts have typically been quite restrained in applying intergovernmental immunity: Whether states are unduly interfering with federal prerogatives is often a question better left for Congress to answer as a policy matter than for federal courts to resolve unilaterally through judge-made doctrines. Intergovernmental immunity is essentially a backstop to preemption in instances of particularly egregious state overreach. It is not, as the federal government would have it, a workaround that allows federal actors to override disfavored state policies when it cannot satisfy the standard for preemption (as the federal government cannot do here, for the reasons set forth by New York and the District Court).

The government's novel effort to use intergovernmental immunity as a cudgel to force unwelcome state-federal cooperation has implications beyond this case. Expanding the doctrine in that way could upend the model of collaborative federalism that defines modern state-federal relations. As *amici* and other scholars have documented, states and the federal government routinely negotiate at the intersection of state and federal authority—over funding requirements, enforcement authority, shared resources, and beyond. The federal government, in essence, seeks to replace negotiation with compulsion. This Court should reject the federal government's attempt to refashion intergovernmental immunity into a doctrine that subverts rather than advances foundational principles of federalism.

## ARGUMENT

### I. INTERGOVERNMENTAL IMMUNITY APPLIES ONLY WHERE STATES PALPABLY SUBVERT FEDERAL SOVEREIGNTY.

A. Intergovernmental immunity is a judicially created federalism doctrine that bars states from "*either* regulat[ing] the United States directly *or* discriminat[ing] against the Federal Government." *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990)). It is one of many doctrines and principles that collectively aim to sustain the Constitution's system of dual sovereignty—a "compound republic" in which interconnected and competing state and federal institutions hold one another in check and keep tyranny at bay. The Federalist No. 51, at 323 (James Madison)

(Clinton Rossiter ed., 1961); *see also Bond v. United States*, 564 U.S. 211, 221 (2011) ("State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.") (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)) (internal quotation marks omitted); *Gregory v. Ashcroft*, 501 U.S. 452, 459 (1991) ("In the tension between federal and state power lies the promise of liberty.").

Like preemption doctrine, intergovernmental immunity is rooted in the Constitution's Supremacy Clause and helps to promote federal primacy. *Cf. New York*, 505 U.S. at 168 (explaining that a state policy "can always be pre-empted under the Supremacy Clause if it is contrary to the national view"). But precisely because the Supremacy Clause is such a potent tool of federal dominance, these doctrines come with important state-protective constraints, and they leave space for a healthy amount of state-federal contestation and negotiation.

Specifically, these federal-protective federalism doctrines come with two distinct types of guardrails. The first is a set of built-in state-protective features. Preemption doctrine, for example, begins by presuming that federal law does *not* displace state law, especially in areas of traditional state authority. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995) ("[W]e have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting

presumption that Congress does not intend to supplant state law."); *Gregory*, 501 U.S. at 460 (describing Congress's ability to "legislate in areas traditionally regulated by the States" as "an extraordinary power" that courts "must assume Congress does not exercise lightly"). To establish preemption, the federal government must identify the specific legal provision that "displac[es] or conflicts with state law," rather than merely "[i]nvoking some brooding federal interest." *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (lead opinion). As detailed below, intergovernmental immunity doctrine likewise respects legitimate state prerogatives and does not treat brooding federal interests as sufficient to override state law.

Second, these federal-protective doctrines are bounded and counterbalanced by separate doctrines that serve to protect the "essential sovereignty of the States." *Alden v. Maine*, 527 U.S. 706, 750 (1999). Flowing from the Tenth and the Eleventh Amendments, as well as from the Constitution's overarching structure, these state-protective doctrines include the principles of anti-commandeering and anti-coercion, which bar the federal government from appropriating state capacity for federal ends or pressuring states to sacrifice their autonomy. *See New York*, 505 U.S. at 178 (the federal government "may not conscript state governments as its agents"); *Printz v. United States*, 521 U.S. 898, 935 (1997) (the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce

a federal regulatory program"); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) (federal law cannot be wielded as a "weapon[] of coercion, destroying or impairing the autonomy of the states") (quoting *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 586 (1937)); *cf. Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002) (noting that the state sovereign immunity recognized by the Eleventh Amendment serves "to accord States the dignity that is consistent with their status as sovereign entities").

Together, these doctrines recognize federal primacy while also protecting each state's "own set of mutual rights and obligations to the people who sustain [the state] and are governed by it." *Printz*, 521 U.S. at 920 (internal citation omitted). They leave space for states and the federal government to engage one another in ways both collaborative and confrontational, often simultaneously. Some of these interactions occur through formal congressional schemes that fuse federal and state implementation in "a program of cooperative federalism." *New York*, 505 U.S. at 167; *see id.* at 167–68 (listing examples, including the Clean Water Act, the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act of 1976, and the Alaska National Interest Lands Conservation Act). Others involve more ad hoc efforts to negotiate "mutually satisfactory arrangements" to manage "problems flowing from our dual system of government." *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 528 (1938); *see generally*

Bridget A. Fahey, *Federalism by Contract*, 129 Yale L.J. 2326, 2331 (2020) (discussing the "broad array of policy areas" in which state and federal actors rely on negotiated "intergovernmental agreements"); Aziz Z. Huq, *The Negotiated Structural Constitution*, 114 Colum. L. Rev. 1595, 1636 (2014) (noting the pervasiveness of "intergovernmental bargaining" between states and the federal government); Erin Ryan, *Negotiating Federalism*, 52 B.C. L. Rev. 1, 4 (2011) (explaining that "the boundary between state and federal authority is actually negotiated on scales large and small, and on a continual basis").

This inter-sovereign push and pull commonly generates friction, but that is a feature, not a bug, of the nation's "compound republic." *Cf.* The Federalist No. 51, at 323 (James Madison) (Clinton Rossiter ed., 1961) ("The different governments will control each other, at the same time that each will be controlled by itself.").

B. Within the constellation of doctrines mediating these complex state and federal interactions, intergovernmental immunity's role is modest. Courts have historically turned to the doctrine only where states acted in ways that plainly and palpably subverted federal sovereignty, essentially turning the Supremacy Clause upside down.

The classic case that spawned the doctrine—*McCulloch v. Maryland*, 17 U.S. 316 (1819)—well illustrates the sort of state action that has been held to violate intergovernmental immunity. *McCulloch* held that Maryland acted

unconstitutionally when it taxed the Bank of the United States, while not taxing other similarly situated non-federal institutions. Chief Justice Marshall famously explained that allowing states to levy taxes on federal institutions could "destroy" those institutions. *See id.* at 427 ("That the power of taxing [the Bank] by the states may be exercised so as to destroy it, is too obvious to be denied."). According to Marshall, a single state had no business exercising control over a national instrumentality established by "the people of the United States." *Id.* at 429. Such action was "the usurpation of a power which the people of a single state cannot give." *Id.* at 430; *see also* Gillian E. Metzger, *Disqualification, Immunity, and the Presidency*, 138 Harv. L. Rev. F. 112, 117–18 (2025) (explaining that the "principle that 'a part' cannot control the whole" undergirds *McCulloch*).

Echoing *McCulloch*, intergovernmental immunity doctrine bars "discriminatory" state policies—in other words, policies that "singl[e] out the Federal Government for unfavorable treatment." *Washington*, 596 U.S. at 839. This rule flows from *McCulloch*'s concern that Maryland had saddled the federal government with a tax that it had not been willing to impose on itself or its own constituents. Maryland lawmakers had essentially sought to thwart national policy while shielding themselves from meaningful political accountability. *See McCulloch*, 17 U.S. at 428 (explaining that, when a state levies a tax on the federal government but not "upon its constituents," it circumvents "[t]he only security

against abuse of [the taxing] power”). The “discrimination” prong of intergovernmental immunity serves to guard against such ploys.

Consistent with this understanding, the Supreme Court’s more recent cases have described the discrimination rule as ensuring a “political check” on the use of state power. *See, e.g.*, *Washington v. United States*, 460 U.S. 536, 544–45 (1983) (“A ‘political check’ is provided when a state tax falls on a significant group of state citizens who can be counted upon to use their votes keep the State from raising the tax excessively, and thus placing an unfair burden on the Federal Government. It has been thought necessary because the United States does not have a direct voice in the state legislatures.”). Like *McCulloch*, many modern intergovernmental immunity decisions involve state financial policies that single out federal actors while avoiding the political backlash that might ensue if similar measures were imposed on non-federal entities. *See Dawson v. Steager*, 586 U.S. 171, 174 (2019) (surveying case law and describing decisions focused on “compensation,” “retirement benefits,” and “employee” and “property tax”).

The other prong of intergovernmental immunity doctrine that emerged from *McCulloch* is that states may not “directly regulate” the federal government. Like the jurisprudence discussing discrimination, many “direct regulation” cases have focused on taxation. *See, e.g.*, *Graves v. New York ex rel. O’Keefe*, 306 U.S. 466, 477 (1939). These cases clarify that although states cannot directly tax the federal

government and its instrumentalities, they can lawfully levy nondiscriminatory taxes on federal employees and contractors, even if those taxes effectively impose costs on the federal government and impact federal operations. The Supreme Court has indicated that, if the federal government wishes to limit such state-created burdens, the answer is federal legislation, not judicially manufactured restraints. *See, e.g.*, *Jefferson Cnty. v. Acker*, 527 U.S. 423, 425 (1999) ("[T]he Court has recognized that the area is one over which Congress is the principal superintendent."); *United States v. City of Detroit*, 355 U.S. 466, 474 (1958) (explaining that "Congress is best qualified to resolve" questions about the parameters of intergovernmental tax immunity).

Beyond taxation, most disputes over the "direct regulation" prong have involved state-imposed fees, permit schemes, or license requirements—all close analogs to taxation. An oft-cited example is *Johnson v. Maryland*, 254 U.S. 51 (1920), in which Maryland prosecuted and convicted a U.S. Post Office employee for operating his federal vehicle without a state-issued driver's license. Reversing the conviction, the Supreme Court explained that the state could not bar federal employees from performing their lawful federal duties until those employees first "satisf[ied] a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on." *Id.* at 56–57. By effectively giving itself a veto over the federal government's management of its workforce (and

adding a fee requirement to boot), the state had improperly attempted "to control" the federal function itself. *Id.*

But the *Johnson* Court was careful to distinguish Maryland's licensing scheme from the myriad ways in which states *can* lawfully impact federal operations without running afoul of intergovernmental immunity. Federal employees, the Court made clear, are not generally immune "from state law while acting in the course of [their] employment," even if the state law "affect[s] incidentally the mode of carrying out the [federal] employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets." *Id.*; *see also Penn Dairies, Inc. v. Milk Control Comm'n of Pa.*, 318 U.S. 261, 271 (1943) (explaining that the mine-run of state regulations touching on federal operations "are to be regarded as the normal incidents of the operation within the same territory of a dual system of government").

In the century since *Johnson*, the Supreme Court has only infrequently addressed the "direct regulation" prong of intergovernmental immunity, which itself underscores that the doctrine is reserved for the rare policy that truly arrogates federal power to a state. Red flags go up when states "make it unlawful to carry out the duties of a federal office without local permission," *Acker*, 527 U.S. at 440–41, or assert "a virtual power of review over the federal [function]," *Leslie Miller, Inc.*

*v. Arkansas*, 352 U.S. 187, 190 (1956). But most state laws that impact, or even frustrate, the federal government's activities do not cross this line.

***

In short, the Supreme Court has historically reserved intergovernmental immunity doctrine for state conduct that effectively turns the Supremacy Clause upside down. Taken together, the doctrine's twin prongs preclude state efforts to subordinate the federal government. But precisely because Congress may displace state law through preemption, intergovernmental immunity doctrine has a limited role to play. As the Supreme Court has recognized, questions about whether states are unduly encroaching on federal power are often better left for Congress to resolve as a policy matter than for federal courts to resolve unilaterally through judge-made doctrine. Intergovernmental immunity is essentially just a backstop to preemption in instances of particularly egregious state overreach. *See North Dakota*, 495 U.S. at 435 (recognizing "the primary role of Congress in resolving conflicts between the National and State Governments"); *cf. CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 331–32 (3d Cir. 2025) (Ambro, J., dissenting) ("Because intergovernmental immunity is such a powerful constraint on states, basic federalism and separation-

of-powers principles limit its application to the clearest state intrusions on federal sovereignty . . . .").[2]

## II. STATES DO NOT DISCRIMINATE AGAINST THE FEDERAL GOVERNMENT WHEN THEY DECLINE TO ASSIST FEDERAL OPERATIONS.

The federal government's chief claim in this appeal is that New York's so-called "tip-off requirement" and its explicit restriction on sharing information with immigration authorities violate intergovernmental immunity because they "discriminate" against the federal government. The government's assertion that the doctrine reaches these policies would take intergovernmental immunity far beyond its current precedential bounds. If adopted, the government's version of the doctrine would effectively force states to subsidize federal operations—a result inconsistent with the Tenth Amendment and the Constitution's federal structure.

As described above, intergovernmental immunity doctrine seeks to confirm that policies regulating federal actors are subject to a "political check." *Washington*,

---

[2] Going further, some courts and scholars have suggested that intergovernmental immunity should simply be regarded as a variant of obstacle preemption rather than as a stand-alone doctrine with independent bite. *See, e.g.*, *United States v. City of Philadelphia*, 798 F.2d 81, 85–86 (3d Cir. 1986) ("While ostensibly a question of governmental immunity this issue is perhaps 'best understood as posing an issue essentially of federal preemption.'") (quoting Laurence H. Tribe, *American Constitutional Law* 391 (1978)); *cf.* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 268–71 (2000) (discussing how *McCulloch*—the font of intergovernmental immunity doctrine—can be read as a preemption case).

460 U.S. at 544–45. To ensure that political check, the doctrine asks whether the United States has been disfavored relative to otherwise-similar non-federal actors. Thus, the Court has invalidated a state income tax that extracted more from a U.S. Marshal than a state law enforcement officer despite "materially identical" duties, *Dawson*, 586 U.S. at 178; a state law that taxed retired federal employees more harshly than state employees despite "no significant differences" between them, *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 816 (1989); and a state tax calculated "on the full value of the real property . . . lease[d] from the Federal Government, while businesses with similar leases, using exempt property owned by the State and its political subdivisions, [were] not taxed on their leaseholds at all." *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 387 (1960). At bottom, the doctrine simply provides that, to the extent federal and non-federal conduct or activities are equivalent, states should treat them equivalently.

New York's restriction on sharing information with immigration authorities and its so-called "tip-off requirement" do not violate this rule. The law does not subordinate federal entities to non-federal parties undertaking the same activities. It treats all individuals the same. By default, resident data is confidential; the statute makes clear that this sensitive information "is not a public record" and "generally shall not be disclosed in response to any request for records." N.Y. Veh. & Traf. Laws § 201(8). Because this nondisclosure rule is the same for all requestors, there

is no discrimination. *See North Dakota*, 495 U.S. at 438 (explaining that state policies "imposed equally on other similarly situated constituents of the State" are not discriminatory). The District Court correctly concluded as much. *See* J.A. 47 ("[T]he Complaint fails to identify any such comparator, and 'differential treatment is critical to a discrimination-based intergovernmental immunity claim.'" (quoting *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022) (internal citation and alteration omitted))).

Nor is it "discriminatory" for the state to forthrightly decline to offer up state resources for a unique and specialized federal use like immigration enforcement. The federal government insists that New York law "singles out federal immigration officials," Br. for Appellant United States 23, because the law explicitly prohibits disclosure "to any agency that primarily enforces immigration law" and directs state officials to notify residents if such an agency seeks access to DMV records. But that is not "discrimination." Intergovernmental immunity simply prohibits states from penalizing federal actors compared to their non-federal counterparts; it does not prohibit a state from recognizing that federal activities are often genuinely unique. *See United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019) (explaining that intergovernmental immunity is "not implicated when a state merely references or even singles out federal activities . . . "); *McHenry Cnty.*, 44 F.4th at 594 ("The mere

fact that the [challenged state law] touches on an exclusively federal sphere is not enough to establish discrimination.") (citation omitted).[3]

A provision stating that federal immigration enforcement is *not* the purpose for which the state collects and maintains sensitive data merely reinforces the state's permissible determination about how to manage the state's own resources. Intergovernmental immunity in no way precludes a state from requiring that *everyone* use a state asset only for the same limited purposes, and not for a distinctive federal function beyond the state program's scope. This is the implicit logic of cases that have rejected intergovernmental immunity challenges when states dictate the use of their own spaces as "proprietors." *See, e.g.*, *Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024) (declining to apply intergovernmental immunity principles because, although Texas brought an action against the federal government alone, Texas sought to "preserve its own property, not to affect federal property").

Properly conceived, the challenged provisions are nothing more than a routine expression of New York's decision not to devote its own resources to assist with immigration enforcement. Federal actors are not entitled to dictate how a state uses its own assets. *See Helvering v. Gerhardt*, 304 U.S. 405, 414–15 (1938) ("[T]he

[3] Notably, if another state—or even New York itself—established an "agency that primarily enforces immigration law," the law would treat that agency the same as any federal immigration agency.

Constitution" protects not just "the continued existence of the states and their continued performance," but also "those means and instrumentalities which are the creation of their sovereign and reserved rights."); *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973) (explaining that only a state is responsible for "operation of its own government") (internal quotation and citation omitted). In fact, the opposite is true: When the federal government seeks to draw upon state capacity for purely federal ends, states are presumptively free to decide whether or how to cooperate. Exercising that choice and declining to offer the federal government special access is not impermissible discrimination; it is simply our federal system at work. *See* Bridget A. Fahey, *The New Commandeering*, 2025 Sup. Ct. Rev. 167, 172 (The Constitution "invest[s] the states with structural self-determination and the resulting power to determine both the legal and material capabilities of their governments and the purposes for which those capacities will be used.").

It is well-established that states, for example, may "elect to decline a federal grant" if the "State's citizens view federal policy as sufficiently contrary to local interests." *New York,* 505 U.S. at 168. Similarly, when the federal government seeks to enlist a state in a federal scheme, "state residents . . . may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program." *Id.* A robust body of law ensures the integrity of those choices. For instance, the Constitution requires that a state's acceptance of federal funding or

joint programming be "voluntary," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 11 (1981), and based on a "true expression of [the state's] will," *Steward Mach. Co.*, 301 U.S. at 590. States must have the option to decline federal overtures "not merely in theory but in fact." *NFIB*, 567 U.S. at 581 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211–12 (1987)) (internal quotation mark omitted); *see also NFIB*, 567 U.S. at 579 (federal law cannot be wielded as a "weapon[] of coercion, destroying or impairing the autonomy of the states") (quoting *Steward Mach. Co.*, 301 U.S. at 586). The throughline is that states are entitled to "remain responsive to the local electorate's preferences," *New York,* 505 U.S. at 168, even—or especially—when those local preferences diverge from the federal government's, *cf.* The Federalist No. 46*,* at 297 (James Madison) (Clinton Rossiter ed., 1961) (explaining that the Constitution gives states leeway to check federal excesses by pursuing policies "unfriendly to the national government" but "generally popular in the State").

Practice confirms that states do not violate intergovernmental immunity by declining to assist the federal government. States routinely choose not to devote their resources to federal regulatory programs and leave the federal government to fill the gap itself. Examples include the Clean Water Act's National Pollutant Discharge Elimination System (NPDES), where states can decide whether to administer federally compliant discharge regulation programs or to leave the federal

government to perform that task, 33 U.S.C. § 1342(b); Medicaid, where states can choose whether or not to take certain actions in exchange for federal funding, 42 U.S.C. § 1396a; *see generally NFIB*, 567 U.S. at 541–43; and even immigration detention, where the federal government may house immigration detainees at state or local facilities, but only "in any State or unit of local government which agrees." 8 U.S.C. § 1103(a)(11)(B). Courts have never suggested that a state's choice to decline a federal overture—even if, as here, codified in state law—constitutes "discrimination."

Nor could such a conception of "discrimination" be viable. Applying intergovernmental immunity to state decisions not to aid federal efforts would run headlong into anti-commandeering doctrine. That is particularly apparent here: the federal government has no inherent entitlement to information a state lawfully gathers and maintains about its residents. A unilateral federal demand for such information raises the specter of unconstitutional commandeering. *See* Fahey, *The New Commandeering*, *supra* at 186 ("[A] command to turn over data is a command to transfer a state asset to federal control."). Indeed, this case echoes the Supreme Court's canonical commandeering decision, *Printz v. United States*, 521 U.S. 898 (1997). There, the Court rejected a federal scheme that required state officials to search state databases to determine whether a firearm sale was lawful. *See id*. at 933 n.17 (explaining that the challenged law compelled state officials to "provide

information that belongs to the State and is available to them only in their official capacity," and to "examin[e] databases and records that only state officials have access to"). Such federal demands, the Court held, were "fundamentally incompatible with our constitutional system of dual sovereignty." *Id*. at 935.

Here, as in *Printz*, the federal government seeks to freeride off state sovereign capacity. It wants to take advantage not only of New York's information, but of the "state-level *legitimacy*" and programmatic effort that enabled New York to accumulate its data in the first place. Bridget A. Fahey, *Consent Procedures and American Federalism*, 128 Harv. L. Rev. 1561, 1601 (2015); *see id.* at 1600 ("Commandeering, seen in this light, does not federalize state resources; it federalizes state *authority* and *legitimacy*."). New York presumably managed to collect this information only because of the confidentiality assurances it offered. By insisting on accessing this information for immigration purposes, the federal government is attempting to exploit the trust and goodwill that New York has cultivated with its residents.

Whether or not the federal government's conduct here itself amounts to an anti-commandeering violation, the Constitution surely gives states breathing room to protect against this sort of federal intrusion into their sovereignty and legitimacy. The federal government's proposed rule—that federal agents are entitled to "most-favored-nation" access to state resources on the same terms as the state itself—is

fundamentally incompatible with anti-commandeering doctrine and federalism principles. As described in Part I, the Constitution's various federalism doctrines work collaboratively to sustain a "compound republic." This Court should reject any invitation to pit intergovernmental immunity against its sibling doctrines. *See McHenry Cnty.*, 44 F.4th at 594 n.7 ("The State's refusal to cooperate in the immigration context—a possibility contemplated by the relevant federal statutes—does not constitute discrimination against the federal government."); *see also California*, 921 F.3d at 891 (to apply intergovernmental immunity's "discrimination" prong to California's "refus[al] to assist [federal] enforcement efforts . . . would be inconsistent with the Tenth Amendment and the anticommandeering rule").

## III. STATES DO NOT DIRECTLY REGULATE THE FEDERAL GOVERNMENT BY SETTING CONDITIONS ON THE USE OF STATE ASSETS.

In addition to its discrimination arguments, the federal government contends that New York's "certification" provision violates the "direct regulation" prong of intergovernmental immunity. That provision conditions the sharing of sensitive state DMV data on the recipient's agreement not to use the information for certain purposes, like immigration enforcement. As discussed in Part II, a state has a core sovereign interest in controlling access to its own assets. Choosing to limit whether and when to share such assets, including with the federal government, does not

amount to a direct regulation on the federal government within the meaning of intergovernmental immunity doctrine.

The sort of policies that the "direct regulation" prong proscribes differ in kind from New York's certification requirement. What states cannot do is assert regulatory "control" over federal operations. *Johnson*, 254 U.S. at 57. Where Congress has authorized the federal government to act, states therefore cannot "make it unlawful to carry out the duties of a federal office without local permission," *Acker*, 527 U.S. at 440–41, or assert "a virtual power of review over the federal [function]," *Leslie Miller,* 352 U.S. at 190. Thus, if a state sought to prohibit the federal government from using *federal* data in ways that federal law allowed, the state would likely violate the doctrine.

New York, in contrast, has not sought to limit access to federal information or assets. It is merely exercising control over its own state resources, not usurping federal power. The federal government seeks the state's data simply because the federal government has not managed to generate equivalent information itself. Placing a condition on access to otherwise-unavailable state data cannot "directly regulate" the federal government, since the federal government has no entitlement to the data in the first place. *Cf. W. Union Tel. Co. v. Kansas ex rel. Coleman*, 216 U.S. 1, 53 (1910) (Holmes, J., dissenting) ("[T]he whole generally includes its parts.

If the state may prohibit, it may prohibit with the privilege of avoiding the prohibition in a certain way.”).

The “certification requirement” is best understood not as a regulatory directive, but rather as a codification of the state’s current position in a contract-like negotiation with the federal government over access to state resources. Such state-federal negotiations are unremarkable. Our federal structure gives states and the federal government significant leeway to establish (or decline to establish) resource-sharing arrangements. “It is of the essence of sovereignty,” the Supreme Court has noted, “to be able to make contracts and give consents bearing upon the exertion of governmental power,” *United States v. Bekins*, 304 U.S. 27, 51–52 (1938), and states, just like the federal government, may bargain for “conditions that will assure a fair and just requital for benefits received,” *Steward Mach. Co.*, 301 U.S. at 598.

The fact that the certification condition applies only if the federal government makes an entirely optional, voluntary decision to seek New York’s data is fatal to the federal government’s “direct regulation” claim. The thrust of the federal government’s argument is that, *if agreed to*, the certification condition would impose constraints that might be constitutionally problematic if unilaterally applied to information already within the federal government’s possession. *See* Br. for Appellant United States 33–34 (arguing that the law “improperly regulates the federal government” because agents “must” promise to not share information and

"officers must also maintain detailed, potentially onerous records reflecting the uses of the information"). But intergovernmental dealings often include proposed limitations or conditions that one government could not otherwise lawfully require. A defining feature of federal spending conditions is that they allow the federal government to "induce the States to adopt policies that the Federal Government itself could not impose" or exert "influence even in areas where it cannot directly regulate." *NFIB*, 567 U.S. at 537. It is no different when a state places conditions on its resources and allows the federal government to choose whether or not to accept the bargain. These are voluntary agreements "in the nature of a contract," not direct regulations. *Pennhurst State Sch. & Hosp.*, 451 U.S. at 17.

The terms of such state-federal exchanges should primarily be worked out through intergovernmental negotiation, not constitutional litigation. Extending intergovernmental immunity to this context risks upending the broader landscape of cooperative and integrated federalism. As scholars have documented, bargaining between the federal government and state and local actors is a defining feature of our federal system. *See supra* Part I.A; *cf. Bekins*, 304 U.S. at 53 (explaining that the Constitution does not "make impossible cooperation between the Nation and the States through the exercise of the power of each to the advantage of the people who are citizens of both"). Using the blunt instrument of intergovernmental immunity to bar states from imposing conditions like those at issue here risks upending the

broader landscape of cooperative and integrated federalism. This Court should decline to do so.

## CONCLUSION

Intergovernmental immunity is a shield to protect the federal government from extreme state usurpation. It is not a sword that the federal government can wield to bar states from protecting their own assets against federal incursions.

For the foregoing reasons, this Court should affirm the District Court and make clear that intergovernmental immunity poses no barrier to the challenged statutory provisions.

Dated: August 17, 2026

Respectfully submitted,

*<u>/s/ David Zimmer</u>*
David Zimmer
Zimmer, Citron & Clarke LLP
711 Atlantic Ave., 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rules 29.1(c) and 32.1(a)(4) and Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 6,053 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in 14 point Times New Roman font.

Dated: August 26, 2026

*/s/ David Zimmer*
David Zimmer

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that I served a true and correct copy of the foregoing brief to all counsel of record via ACMS on this 26th day of August, 2026.

Dated: August 26, 2026

*/s/ David Zimmer*
David Zimmer

*Counsel for Amici Curiae*